### DEUTSCHE BANK UND DISCONTO-GESELLSCHAFT v. CUMMINGS, Atty. Gen., et al.

### No. 6471.

United States Court of Appeals for the District of Columbia.

Argued Dec. 5, 1935.

Decided Feb. 17, 1936.

On Rehearing May 4, 1936.

Thos. H. Creighton, Jr., and James J. Lenihan, both of Washington, D. C., and Otto C. Sommerich, of New York City, for appellant.

Leslie C. Garnett, U. S. Atty., and Harry Le Roy Jones, Frank C. Sterck, and Edward First, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

Appellant is a consolidated corporation of Germany with its principal place of business in Berlin. Its predecessor company, Direction der Disconto-Gesellschaft, was an enemy alien whose property was seized by the Alien Property Custodian and subsequently converted into money and other property and deposited by him in the Treasury of the United States to his credit in a single trust known as trust number 49,851. The bill alleges: "that prior to the 16th day of February, 1933, and pursuant to the provisions of the Trading with the Enemy Act as amended and the Settlement of War Claims Act, the plaintiff herein and/or its predecessor filed its notice of claim under oath with the Alien Property Custodian containing such particulars as required by law and by the rules and regulations of the Alien Property Custodian and made application to the President of the United States for the return to it of said property. * * * That prior to the commencement of this action the * * * Alien Property Custodian determined that the plaintiff herein was the owner of said property and entitled to the return of said property as provided for by the Trading with the Enemy Act as amended by the Settlement of War Claims Act of 1928."

The bill then alleges that, before delivery of the property to appellant, one Sprunt and others brought an attachment proceeding against appellant, claiming rights in the property in question; that this proceeding was dismissed by final decree the 24th of May, 1934; and that thereafter appellant made due demand for the property, and that demand was refused, because of the provisions of Public Resolution No. 53.[1]

The suit below was for a hearing and decree directing the return of the property. The lower court dismissed the bill for lack of jurisdiction.

The history of our war-time legislation with reference to enemy property found in the United States has been detailed and discussed so many times over the past fifteen years by the Supreme Court and this court, that little can be said here that would not be repetition. For our present purposes, it is enough to say that shortly after the entry of the United States into the World War, Congress passed the Trading with the Enemy Act,[2] under the provisions of which the United States took possession of all enemy property and held and used it for the period of the war and for sometime thereafter. The purpose of Congress with relation to property seized is shown by the reports of the committees of Congress, and by the act itself, to have been in whole-hearted accord with the modern usage and practice of nations—usage and practice which disclaims the right of confiscation. For instance, while the bill was under consideration, Secretary Redfield, explaining on behalf of the administration its objects to the committee on commerce, said that the creation of the office of Alien Property Custodian was in line with the desire of the administration to show that the policy to be pursued by the United States with relation to property of enemy nations was the opposite of confiscation (Hearings, May 29, 1917, p. 13). Likewise the committee, in reporting the bill, stated: "A more enlightened opinion prevails at the present time, and it is now thought to be entirely proper to use the property of enemies without confiscating it" (Report No. 113, Committee on Commerce, 65th Cong., 1st Session).

The act, in section 12 (50 U.S.C.A. § 12), declares that "after the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct." And Congress shortly after the war adopted a policy of piecemeal return of the property to its former owners. In the recent case of Woodson v. Deutsche Gold, etc., 292 U.S. 449, 54 S.Ct. 804, 805, 78 L.Ed. 1357, the Supreme Court, speaking to this section of the act, said: "Section 12 declares that after the end of the war any claim of any enemy to recover money or property received and held by the Custodian or deposited in the United States Treasury 'shall be settled as Congress shall direct.' 40 Stat. 424 [see 50 U.S.C.A.Appendix § 12]. While this suggests that confiscation was not effected or intended, it plainly shows that Congress reserved to itself full freedom at any time to

---

[1] June 27, 1934, 48 Stat. 1267.

[2] 40 Stat. 411 (see 50 U.S.C.A. Appendix, § 1 et seq.).

dispose of the property as might be deemed expedient and to deal with claimants as it should deem to be in accordance with right and justice, having regard to the conditions and circumstances that might arise during and after the war."

In view of this interpretation of the section by the Supreme Court in the above-named case—as well as many others preceding it—it may now be considered as settled law that the seizure of enemy property carried with it the right on the part of the United States, if exercised, to dispose of it. But it may be said to be equally settled by a consistent line of congressional enactments that the purpose of the United States never was confiscation and that confiscation never was resorted to. The effect, therefore, of the legislation was to transfer possession and title to the Custodian for the purpose of conversion into money, etc., while at the same time preserving in the original owner a contingent beneficial interest; that is to say, an interest subject to such conditions as Congress might thereafter affix to its return. This purpose of Congress to which we have referred is shown also by the legislation—which may be described as preliminary legislation—after the conclusion of the war; i. e., the act providing for the return of the property of American wives of Germans;[3] for the return of property to citizens of Czechoslovakia and other countries who were at the time of seizure citizens of Austria-Hungary;[4] the Winslow Act of March 4, 1923, directing the return up to $10,000 to every owner, including German owners, and of income up to $10,000 annually on property held by the Custodian, to every owner, including German owners.[5]

The war was officially declared ended July 2, 1921.[6] This was followed August 25, 1921, by the Treaty of Berlin[7] and by the establishment, August 10, 1922, of the Mixed Claims Commission.[8]

The Commission was created to determine the amount of money which Germany should pay to the United States in satisfaction of its financial obligations under the Treaty of Berlin, and was followed by the Debt Funding Agreement of 1930, making a settlement of claims of the United States and of its citizens against the German Government. By its terms Germany agreed to pay forty million odd reichmarks annually from September 1, 1929, to March 31, 1981. But in 1928—two years before the Debt Funding Agreement—Congress passed the Settlement of War Claims Act,[9] "To provide for the settlement of certain claims of American nationals against Germany, Austria, and Hungary, and of nationals of Germany, Austria, and Hungary, against the United States, and for the ultimate return of all property held by the Alien Property Custodian."

The plan provided, subject to certain exceptions not material here, that when the person entitled to the property—i. e., the German enemy—had filed written consent to a postponement of the return of an amount equal to 20 per centum of the aggregate value of the money or property, the President might order its payment or delivery; and in the event it was not delivered the former owner might institute suit in equity as provided by subsection (a) of section 9 of the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix § 9 (a). Subsection (a) in turn provided: "If the President shall not so order within sixty days after the filing of such application or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may institute a suit in equity in the Supreme Court of the District of Columbia"—and the court may "make and enter * * * all such orders and decrees, and * * * issue such process as may be necessary and proper * * * to enforce the provisions of this Act." Section 17 (50 U.S.C.A.Appendix, § 17).

In short, Congress in the War Claims Act directed the return in part to its German owners of the property seized by the Alien Property Custodian, provided they would consent in writing to the postponement of the delivery of an amount equal to 20 per cent. It also, as we have seen, provided recourse to the courts for the establishment of their claims and for a decree for the return of the property.

The bill in this case alleges that the appellant has filed notice of claim and consent as required by the act, to the postponement of the return of an amount equal to 20 per cent. of the value of its seized property, but that by reason of the passage by

---

[3] 41 Stat. 977 (50 U.S.C.A. Appendix § 9 note).

[4] 41 Stat. 977.

[5] 42 Stat. 1511.

[6] 42 Stat. 105.

[7] 42 Stat. 1939.

[8] 42 Stat. 2200.

[9] 45 Stat. 254.

Congress of a resolution known as Public Resolution No. 53 of June 27, 1934, the Attorney General, as acting Custodian, has refused to recognize appellant's right or to make delivery of its property.

It is conceded that under the provisions of the act approximately 95 per cent. of the property taken by the Custodian under the Trading with the Enemy Act has been returned to its former owners (of the same class as appellant); and appellant's position on this appeal is that Congress, having in the act directed the return of 80 per cent. of the property on condition that the original owner would postpone demand for the remaining 20 per cent., the right of appellant to the 80 per cent. was fixed by the law in force when it filed its consent to the use of such 20 per cent. by the United States for the purpose set forth in the act (the fund representing the 20 per cent. was paid into the special deposit account for distribution to American claimants against Germany).

In other words, that Congress, having revested title in the former owner, it cannot constitutionally destroy this vested right by subsequent legislation.

Appellant says that it cannot be fairly contended that as to the 95 per cent. of seized property already delivered under the provisions of the act, Congress has the right by the passage of subsequent legislation, to reseize the property; and that, if this is true, it insists the mere act of physical delivery in the one case, postponed in the other by the filing of an attachment suit by a third party, cannot enlarge the right.

The question is of great importance.

On June 27, 1934, Congress passed Public Resolution No. 53 (48 Stat. 1267). In its preamble the resolution refers to a joint resolution of July 2, 1921, in which Congress declared that the property of German nationals seized by the United States should be retained "except as shall have been heretofore or specifically hereafter shall be provided by law" until the German Government has made suitable provision for the satisfaction of claims of American nationals. The resolution then recites the subsequent treaty between the United States and Germany, the establishment of the Mixed Claims Commission, and the Debt Funding Agreement of June 23, 1930, in which Germany agreed to pay the United States certain sums of money annually in satisfaction of awards made by the Mixed Claims Commission; and then declares that Germany has failed to keep that engagement and, therefore, so long as Germany is in arrears, any and "all payments, conveyances, transfers, or deliveries of money or property or the income, issues, profits, and/or avails thereof authorized or directed to be made under the Trading with the Enemy Act, as amended, or the Settlement of War Claims Act of 1928, as amended, whether or not a judgment or decree has been entered with respect thereto, shall be postponed and the money or property, or the income, issues, profits, and/or avails thereof reserved," etc.

The President is authorized in his sole discretion to remove the restriction and likewise to determine the period or periods in which Germany is in arrears in payment.

From what has been said, it is obvious that, except for the passage of this resolution, appellant on dismissal of the attachment suit would have received the money and securities which, as the bill alleges, the Alien Property Custodian had determined it was entitled to receive. And this brings us to the question whether, in view of the passage of the resolution, the suit can be maintained.

The lower court was of opinion that the effect of the resolution was to withdraw the consent of the United States to be sued. We are of opinion that the language of the resolution does not go so far.

 Undoubtedly this is a suit against the United States and can only be maintained if the United States has given its consent to be sued. Von Bruning v. Sutherland, 58 App.D.C. 258, 29 F.(2d) 631; Banco Mexicano v. Deutsche Bank, 53 App.D.C. 266, 289 F. 924, affirmed by the Supreme Court, 263 U.S. 591, 44 S.Ct. 209, 68 L.Ed. 465. But, as we have pointed out, section 11 of the Settlement of War Claims Act of 1928 (45 Stat. 270), authorizing former enemy owners to proceed under subsection (a) of section 9 of the Trading with the Enemy Act, specifically gives a right of action to such enemy owners to proceed in the Supreme Court of the District of Columbia to establish their claims and to have a final decree for restoration. And while, as we think, Congress retained the power to withdraw the consent at any time, Lynch v. United States, 292 U.S. 571, 581, 54 S.Ct. 840, 78 L.Ed. 1434, until withdrawn the privilege to sue cannot be challenged. And, in the view we take of

the language used by Congress in the resolution, nothing there can be said to constitute a withdrawal of consent. Certainly there is no apt language used to that effect. And we take it to be true that the same formality necessary to create the right is equally necessary to its withdrawal. The resolution is not confiscatory of the property here in suit. It is not, as we think, a withdrawal of consent to be sued. And the omission or failure so to declare, we cannot think was inadvertent—if for no other reason—because it is now a well recognized principle that, though no sovereignty can be arraigned before any tribunal without its consent, yet on the other hand, that its own tribunals should be open to causes in which the sovereign is a party with as much freedom as between private parties. Vat.Int.Law, B. 1, Sec. 164. In this view, it follows necessarily that the lower court was in error in dismissing the bill. And this brings us to the main question whether the resolution is or is not violative of the provisions of the Fifth Amendment of the Constitution of the United States.

In Pacific Mail S. S. Company v. Joliffe, 2 Wall. 450, 457, 17 L.Ed. 805, Mr. Justice Field stated the rule as follows: "When a right has arisen upon a contract, or a transaction in the nature of a contract authorized by statute, and has been so far perfected that nothing remains to be done by the party asserting it, the repeal of the statute does not affect it, or an action for its enforcement. It has become a vested right which stands independent of the statute."

In the case of Ettor v. Tacoma, 228 U. S. 148, 33 S.Ct. 428, 431, 57 L.Ed. 773, the state of Washington passed a statute giving to abutting property owners compensation for consequential damages growing out of an original street grading made under municipal direction. After the plaintiff's damage had occurred, a law was passed repealing such legislation. The Supreme Court, though conceding that the damages which the plaintiff had sustained were "consequential" damages, and that in the absence of statute there was no liability for such damages, nevertheless held that the repealing act deprived plaintiff of a right which had vested and which, having vested, was a property right which could not be defeated by subsequent legislation; and the court said: "The principle has been applied in reference to rights accruing under a variety of statutes when affected by a subsequent change of the law."

In the recent case of Coombes v. Getz, 285 U.S. 434, 52 S.Ct. 435, 436, 76 L.Ed. 866, the court held that a director's liability, created by a statute, could not be avoided by legislation repealing the statute subsequent to the loss. Mr. Justice Sutherland said: "His cause of action was not purely statutory. It did not arise upon the constitutional rule of law, but upon the contractual liability created in pursuance of the rule. Although the latter derived its being from the former, it immediately acquired an independent existence competent to survive the destruction of the provision which gave it birth. The repeal put an end to the rule for the future, but it did not and could not destroy or impair the previously vested right of the creditor * * * (Ettor v. Tacoma, 228 U.S. 148, 156, 33 S.Ct. 428, 57 L.Ed. 773; Pritchard v. Norton, 106 U.S. 124, 132, 1 S.Ct. 102, 27 L.Ed. 104) to enforce his cause of action upon the contract."

These cases, and those cited in the opinions to sustain them, establish the rule that vested rights cannot be destroyed, divested, or impaired by direct legislation. But while this is true, it is also true that the rule has no application in the case of congressional gratuities or things of that nature, such as bounties or pensions, for they involve no agreement of parties, and the grant of them creates no vested right. And so it has been said that benefits conferred by gratuities may be redistributed or withdrawn at any time in the discretion of Congress. Lynch v. United States, 292 U.S. 571, 577, 54 S.Ct. 840, 844, 78 L.Ed. 1434.

Do the rights claimed here rest on any firmer base?

Undoubtedly the rule to which we first referred applies to contracts of the United States, for as Mr. Justice Brandeis states in Lynch v. United States, valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States, and the Fifth Amendment protects such contracts. The only difference between contracts of the sovereign and contracts of the individual, in such circumstances, is that in the case of the sovereign "they confer no right of action independent of the sovereign will"; and hence no suit may be brought upon them except by consent of the sovereign.

But if we are right in thinking that consent in this case was given and is not withdrawn, we may lay aside that aspect entirely; and, in this view, consider the exception to the rule we have mentioned, and whether appellant is within its terms.

The exception relates, as pointed out, to rights arising out of congressional bounties or gratuities; and as to all such, as we have seen, "Congress has the right to give, withhold, distribute, or recall, at its discretion." United States v. Teller, 107 U. S. 64, 68, 2 S.Ct. 39, 43, 27 L.Ed. 352. With reference to the rule and the exception, therefore, it may be stated that, as to contracts which are legal obligations of the United States, its rights and duties are governed by the law applicable to contracts between private individuals (Lynch v. United States, supra, 292 U.S. 571, at page 579, 54 S.Ct. 840, 78 L.Ed. 1434) that equally, as to rights conferred as gratuities, the United States has the right to withdraw them at any time without being answerable for its action. But there is a middle ground between the two. This arises under circumstances like those mentioned in United States v. Realty Company, 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215. That case involved the appropriation of money by Congress to be paid to certain manufacturers and producers of sugar who had complied with the provisions of an act of Congress. It was admitted that the plaintiff had complied, but payment was refused (163 U.S. 427, at page 431, 16 S. Ct. 1120, 1125, 41 L.Ed. 215) because a subsequent act prohibited payment, and also because it was contended that the original act was unconstitutional. The Supreme Court, without deciding whether the appropriation was beyond the power of Congress, held that, even assuming it was, the plaintiff had acquired a claim against the government of "an equitable, moral, or honorary nature"; that the nation, speaking broadly, owed a debt to an individual when his claim grew out of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, and that the power of Congress extended to the payment of such a debt. While little is said in the opinion about the repealing statute which there, as here, directed the Treasury not to pay the claim, it is noticed; and it is a safe assumption that the court would not have held the claim recoverable if the repealing act had been a valid obstacle.

In United States v. Cook, 257 U.S. 525, 528, 42 S.Ct. 200, 201, 66 L.Ed. 350, the Supreme Court permitted an architect to recover compensation in addition to that contracted for and legally recoverable, growing out of delays as the result of the San Francisco earthquake and fire, on the ground that "there was the moral consideration which properly induced the recognition of an honorable obligation and turned an unenforceable equity into a binding and effective provision." Or, in other words, into a vested right.

Guided and, as we think, controlled by these principles, we turn to the facts in the present case to determine if what occurred here was of such a nature as to amount to the recognition of an honorable obligation, sufficient to turn an unenforceable equity into "a binding and effective provision."

Two months before the United States entered the war, and at a time when Germans and Austrians were beginning to transfer their property abroad for fear of its seizure in the event of war, the Secretary of State of the United States issued a statement in which he said the government would, in no circumstances, take advantage of a state of war to take property to which international understanding and the recognized law of the land gave it no just claim or title; that it would scrupulously respect private rights alike of its own citizens and of the subjects of foreign states.

When the Trading with the Enemy Act was under consideration, the committee reported,[10] "Under the old rule warring nations did not respect the property rights of their enemies, but a more enlightened opinion prevails at the present time, and it is now thought to be entirely proper to use the property of enemies without confiscating it."

And when the Settlement of War Claims Act was under consideration, the report of the Committee on Finance of the Senate[11] stated in so many words that Congress not only had refused to exercise the power of confiscation, but "up to the present time * * * has clearly by legislation asserted its policy to be the very contrary of confiscation."

The Act itself substantiates this statement. For instance, it requires the con-

---

[10] Report No. 113, Committee on Commerce, 65th Cong., 1st Session.

[11] 70th Congress, 1st Session, Report No. 273.

sent of the former owners of the property to the retention of the 20 per centum, and this 20 per centum retention was itself the result of an agreement between American claimants against Germany and the German claimants against the funds in the hands of the Alien Property Custodian.[12] It authorizes the Custodian to withdraw outstanding demands against German property upon payment of the 20 per cent.[13] It requires the payment of taxes to the United States upon the seized property,[14] and it speaks of the former owners as "the persons entitled thereto." [15]

That this policy on the part of Congress is in complete accord with modern thought and the custom and usage of civilized nations, is beyond contradiction. Chief Justice Marshall, in United States v. Percheman, 7 Pet. 51, 86, 8 L.Ed. 604, says that, even in cases of conquest, "the modern usage of nations, which has become law, would be violated; that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated." And John Bassett Moore, in his Digest of International Law, vol. 7, pp. 312, 313, says that the correct modern view is that enemy private property ought never to be confiscated and that the exercise of the right is both ancient and barbarous.

We feel no hesitation in saying, therefore, that nothing can be found in our laws or proceedings with relation to the recent war, to countenance the view that it was ever the purpose to confiscate to the use of the United States enemy property found in the United States. And we have been referred to no decision of the Supreme Court, and we know of none, in which it is held to the contrary. It is quite true that in a number of cases, notably the Chemical Foundation Case, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131, Henkels v. Sutherland,[16] and Woodson v. Deutsche Gold, etc., supra, the Supreme Court has said that the United States could do what it pleased with the property, but this is no more than the recognition of the right—a right based on

might—and does not even imply its application. On the contrary, Mr. Justice Butler in the Woodson Case, in discussing the effect of the early statute, says that it suggests confiscation was not effected or intended. The suggestion is even more pronounced in the later statutes. And so Judge Hand said in Commissioner v. Stearns,[17] "the power to confiscate was held in reserve, but it was not exercised and might never be"; and so, also, Judge Cardozo in Techt v. Hughes, 229 N.Y. 222, 244, 128 N.E. 185, 192, 11 A.L.R. 166, said: "Title [to seized enemy property], however, would be unchanged, in default of the later exercise by Congress of the power of confiscation * * * now seldom brought into play in the practice of enlightened nations."

It may therefore, as we think, be safely asserted that our policy throughout was to remove such property from its owners for the period of the war, but with the ultimate purpose and intention of restoring it after the war.

When the United States and Germany entered into a Debt Funding Agreement (1930), this government accepted "the full faith and credit of Germany" in payment of its obligations to the United States. It asked no security and stipulated, as to the seized property in its hands, that it should not be required to release the same other than "as heretofore or hereafter authorized by the Congress of the United States." But it had more than two years theretofore agreed to the return of four-fifths of all in its hands; and from time to time to the passage of Public Resolution No. 53 the release had been consistently carried out in accordance with the Act (Settlement of War Claims Act).

By the provisions of this act Congress formally and positively surrendered the rights as captor which it might have asserted against seized enemy property. It placed the United States definitely in the position of trustee for the benefit of former owners. It reserved to itself neither claim nor right nor title to the property. It did more than this. It recognized and put into

---

[12] Subdivision (m) of section 9 (50 U.S.C.A. Appendix § 9(m).

[13] Sections 29(a), 29(b), 50 U.S.C.A. Appendix, § 29(a, b).

[14] Section 24, 50 U.S.C.A. Appendix, § 24.

[15] Section 9 (m), (p), section 25 (e), section 26 (b), and subsections (d), (g),

(j) of section 9, 50 U.S.C.A. Appendix, §§ 9(d, g, j, m. p), 25(e), 26(b).

[16] 271 U.S. 298, 46 S.Ct. 524, 70 L.Ed. 953, 51 A.L.R. 229.

[17] (C.C.A.) 65 F.(2d) 371, 374, certiorari denied Stearns v. Burnet (Oct. 16, 1933) 290 U.S. 670, 54 S.Ct. 90, 78 L.Ed. 579.

final effect a policy adopted from the beginning of the war; that is to say, a policy of trusteeship rather than a policy of confiscation.

■ In this view, it may be granted that the war powers of the United States included the positive right of confiscation; it may be granted also that this right continued even after peace was re-established; and that the right, arising, as it does, out of the war powers of the government, is not affected by the provisions of the Constitution in relation to due process or the taking of property without just compensation. —Yet it cannot, we think, be contended that the seizure of itself and without more transferred ownership and destroyed title. The seizure, of course, transferred control, and the rights of the owner were in abeyance until Congress elected either to confiscate or to return. But having exercised the option, having renounced the power to hold the property, having declared the terms on which it would restore possession, and those terms being complied with by the former owner, we think it must be decided that its war power is exhausted. Certainly this is true of the property actually delivered, and if true as to that, it seems to us in principle it is also true as to that which was withheld subject only to the condition that the title as against an adverse claimant should be established. In both cases the United States unqualifiedly renounced the exercise of its war power of confiscation and re-established title in the former owner, and it is too late now to have recourse to that power to take back rights which it has by formal act restored.

We are, therefore, of opinion that by the terms of the act:

First, the United States consented to be sued; and that it never has withdrawn that consent;

Second, that Congress by a constitutional law authorized and directed the return to appellant of 80 per cent. of its seized property upon its agreement to accept 80 per cent. and to postpone the return of 20 per cent.;

Third, that appellant has complied in all respects with the provisions of the act, and prior to the passage of Public Resolution 53 was duly found to be entitled to the return of the property and money demanded in this suit;

Fourth, that appellant's property was never confiscated by the United States and,

therefore, never became the property of the United States in the sense of the public funds of the United States;

Fifth, that the War Claims Act recognizes the beneficial title of appellant to the property; and that Congress had power, in the recognition of this right, to order restoration of the property; and that in such action the element of gratuity was wholly lacking;

Sixth, that the act restoring the property established a vested right in appellant which is not affected by the subsequent passage of Public Resolution No. 53; and

Seventh, that in any case the act, in recognizing an "honorable obligation," turned an "unenforceable equity into a binding and effective provision."

Reversed.

### On Motion for Rehearing.

PER CURIAM.

The grounds on which the motion is made include one not brought to our attention on the previous argument. It is that the rights conferred upon appellant by the Settlement of War Claims Act (45 Stat. 254) were political and are, therefore, not subject to judicial review.

■ We are sure it is unnecessary to say that we would not wittingly assume any jurisdiction or do any act which directly or indirectly would embarrass the powers of the government in the control of international relations, and the same declaration has been made by the Supreme Court. Mackenzie v. Hare, 239 U.S. 299, 311, 36 S.Ct. 106, 60 L.Ed. 297. However, the most meticulous observance of that rule would not justify our refusal to examine the question, when it is raised, precisely as we would examine any other question in the case and if, in our opinion, we find it not well taken, so to declare.

We are now told that appellant's "rights" under the Settlement of War Claims Act are not different from those it would have been granted had the terms of the Settlement of War Claims Act been contained in a treaty negotiated between the United States and Germany; and that it is "hornbook law that such rights as are acquired by an alien pursuant to treaty are political and not proprietary in the sense that any impairment is judicially examinable." Chae Chan Ping v. United States, 130 U.S. 581, 9 S.Ct. 623, 631, 32 L.Ed.

1068, is cited in support of this proposition. In that case it was said that Congress is invested with plenary power over foreign relations and that its action in reference to political rights is wholly one of foreign policy, international in aspect, and not subject to judicial inquiry or decision. But the facts which the court dealt with in that case are so wholly different from those which we have here that, in our opinion, the rule there is inapplicable here.

In the Chae Chan Ping Case this government had by treaty with the Chinese Empire agreed that there might be free migration and immigration of the citizens and subjects of the two countries. A Chinese resident in San Francisco returned to China, having in his possession a certificate in terms entitling him to return to the United States. On his return he was held for deportation under an act of Congress approved October 1, 1888 (25 Stat. 504). On a petition for habeas corpus he assailed the validity of the act as in violation of existing treaties between the United States and China. When the case reached the Supreme Court, that court said: "The power of exclusion of foreigners being an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the Constitution, the right to its exercise at any time when, in the judgment of the government, the interests of the country require it, cannot be granted away or restrained on behalf of any one. The powers of government are delegated in trust to the United States, and are incapable of transfer to any other parties. They cannot be abandoned or surrendered. Nor can their exercise be hampered, when needed for the public good, by any considerations of private interest. The exercise of these public trusts is not the subject of barter or contract. Whatever license, therefore, Chinese laborers may have obtained, previous to the act of October 1, 1888, to return to the United States after their departure, is held at the will of the government, revocable at any time, at its pleasure. * * * If there be any just ground of complaint on the part of China, it must be made to the political department of our government, which is alone competent to act upon the subject."

This statement by the court, as will be observed, is confined to the proposition that Congress has at all times a continuing right to change and modify a treaty involving personal rights and that, when it acts in that respect, all questions arising out of its action are political and not subject to judicial review. But there is no such question here; and there the Supreme Court was at pains to point out the difference between rights of a political nature and rights involving property. As to the latter, the Supreme Court said: "The rights and interests created by a treaty, which have become so vested that its expiration or abrogation will not destroy or impair them, are such as are connected with and lie in property capable of sale and transfer, or other disposition. * * *"

The case, as we think, distinctly recognizes that, *even under a treaty*, property rights may become so vested as to be protected by the Fifth Amendment. Nor do we find anything different in either Taylor v. Morton, 2 Black, 481, 17 L.Ed. 277, or Foster v. Neilson, 2 Pet. 253, 314, 7 L. Ed. 415. In the first, the question was in relation to the amount of duties collectible on imports from Russia, and it was argued that because of the treaty between the United States and Russia, no higher rate of duty could be imposed by the United States on importations than was charged by Russia in the case of importations from the United States. In the Supreme Court the case was not considered on its merits, and there is nothing in the opinion which has any relation to the question we are considering. The other case involved the question of title and boundary in a dispute involving a piece of land in Mississippi claimed under a grant from the Spanish crown on the one hand and a grant from the United States on the other. The question turned upon the treaty with France involved in the Louisiana Purchase, and Chief Justice Marshall, referring generally to the subject of such treaties, said: "* * * When either of the parties engages to perform a particular act—the treaty addresses itself to the political, not the judicial department; and the Legislature must execute the contract before it can become a rule for the court."

Without more, therefore, we are constrained to say that we find nothing in this new question which will justify a rehearing.

The other points pressed upon us are largely an elaboration of those that were presented and considered in our decision. Counsel, however, cite Frelinghuysen v. Key, 110 U.S. 63, 3 S.Ct. 462, 470, 28 L.

Ed. 71, and United States ex rel. Boynton v. Blaine, 139 U.S. 306, 11 S.Ct. 607, 35 L. Ed. 183, as authority to the point that no right vested in appellant under the Settlement of War Claims Act until the property actually physically passed into its possession.

We think neither of these cases is authority to sustain that position. Both involved the same facts. The United States and Mexico had entered into a treaty for the settlement of claims of the citizens of each country against the other and for the appointment of a commission whose decision should be final. An award was made, among others, to two citizens or corporations of the United States and was paid in installments, but before the entire amount of the award had been turned over to the claimants, it was charged by Mexico that the awards had been made on fraudulent testimony; and on this ground the Secretary of State declined to permit the money then in hand to be turned over. Proceedings by mandamus were begun to require payment. The opinion shows that the treaty was exclusively between the two governments; that the claimants were not parties; and that only such claims could be referred to the commission as were approved by the respective governments; and that this government itself undertook the duty of investigating the evidence and presenting the claim. Its good faith was therefore involved. The court said: "The United States, when they assumed the responsibility of presenting the claims of their citizens to Mexico for payment, entered into no contract obligations with the claimants to assume their frauds and 'to collect on their account all that, by their imposition of false testimony, might be given in the awards of the commission. As between the United States and the claimants, the honesty of the claims is always open to inquiry for the purposes of fair dealing with the government against which, through the United States, a claim has been made."

In the Boynton Case the same conclusion, practically, was reached, with the addition that the Supreme Court held that in the payment of the awards the President was vested by the act of Congress with discretionary power and was, therefore, not subject to mandamus.

In both cases the ground of the decision was that the rights claimed arose out of a treaty over which the political department of the government had control and that, as the government was itself the party claimant and responsible for the bona fides of the claims, it would seriously embarrass its international relations and dealings if the court held claimants entitled to receive the fund in spite of the alleged fraud.

And, as we have said, that is a wholly different situation than the one confronting us. If, as we have decided, the effect of the Settlement of War Claims Act, when its terms were accepted by appellant, created vested rights in appellant protected by the Constitution, we cannot refuse to declare that fact and to afford relief simply because to do so might embarrass the executive department of the government in the collection of the debts due by Germany to the United States. And in this view we think it is incorrect to say, as counsel say in the brief in support of the motion, that, assuming that vested rights comparable to contract rights, were bestowed upon the appellant, these can be lawfully altered by the Congress in the exercise of a paramount power. We think, on the other hand, that the provision of the Constitution on which we based our conclusion, is the paramount law. And we think there is nothing in Lynch v. United States, 292 U. S. 571, 54 S.Ct. 840, 78 L.Ed. 1434, to the contrary.

Appellant, when it filed its consent to the provisions of the War Claims Act and agreed to accept 80 per cent. of the amount and value of its seized property and to release 20 per cent. to the payment of claims of American citizens against Germany, appeared in the role of an alien friend. Its former status as an alien enemy was changed by the terms of the Treaty of Berlin, and to paraphrase the language used by Chief Justice Hughes in Russian Fleet v. United States, 282 U.S. 481, 491, 492, 51 S.Ct. 229, 232, 75 L.Ed. 473, as an alien friend, embraced within the terms of the Fifth Amendment, it cannot be said that its property is subject to confiscation because its government has defaulted in the payment of its debts to the United States. "The provision that private property shall not be taken for public use without just compensation establishes a standard for our government which the Constitution does not make dependent upon the standards of other governments." Therefore, at the risk of unnecessary repetition, we repeat what we have already said, namely, that we fully recognize that the war powers of the United States gave them the

right to confiscate the property of an enemy found in this country; but we assert, as equally true, that there can be no confiscation of enemy property, in the sense that title is changed and the rights of the original owner destroyed, without an act of Congress to that effect. The declaration of war is not such an act. It has never been held that a state of war operated of itself and by its own force to accomplish a transfer of the title of property. Brown v. United States, 8 Cranch, 110, 3 L.Ed. 504.

In the decision which we are asked to review and reconsider, we have shown that from the moment war between the United States and Germany became imminent, through the whole course of the war, and to and until several years after the passage of the Settlement of War Claims Act —indeed to the present moment—Congress not only has not passed any act of confiscation of enemy property, but has consistently and steadfastly declared to the people of the United States and to the world a purpose not to indulge that right. And we have shown, likewise, that the policy originally adopted by Congress, and adhered to throughout, was that which in our times—indeed from the time of the establishment of our government—has been universally recognized by civilized peoples as the policy which morality, humanity, and wisdom demanded. When Congress established the office of alien property custodian, it clothed that official with the power to seize and hold and use, and in his discretion to convert into a different form, property of alien enemies found in the United States; but the power of confiscation it held in abeyance. With the seizure went the declaration that the return would be subject to such conditions as Congress might apply. Several years after the close of the war, and after a formal treaty of peace, Congress named the conditions, and appellant, as is admitted, conformed to those conditions in every respect. By the ordinary rules of contract there was then a meeting of minds, and the rights which appellant asserts in this suit became fixed and vested. To say now, as we are asked to say, that the paramount power—the power to confiscate—which concededly Congress had in the prosecution of the war, but which it never exercised, continued thereafter and indefinitely, because alone of the failure of the physical act of delivery, would be to assert a principle for which we can find no authority anywhere. Construing the treaty with England after the Revolution, Judge Story said of it, "for the treaty itself extinguished the war, and, with it, the rights growing out of war." Orr v. Hodgson, 4 Wheat. 453, at page 462, 4 L.Ed. 613. Certainly there is nothing in Hart v. United States, 118 U.S. 62, 6 S.Ct. 961, 963, 30 L.Ed. 96, to support the right; for that was a case which involved the payment of money out of the treasury of the United States—money of the United States—controlled by that article of the Constitution which provides that, "No money shall be drawn from the treasury but in consequence of appropriations made by law." Here, if we are correct, no money of the United States is involved, and no property to which the United States has ever claimed title. But, on the contrary, the subject-matter here is property which, though subject to confiscation, never was confiscated, and which, on the reestablishment of peace between Germany and the United States, was ordered returned if and when the owner thereof consented to the conditions imposed by Congress. Nor is there anything in District of Columbia v. Eslin, 183 U.S. 62, 22 S. Ct. 17, 46 L.Ed. 85, to the contrary of the view we have adopted, for that case involved, not as here a property right, but a gratuity which Congress could give or withhold as it pleased.

There remains only to consider the question, whether the remedy sought by appellant is proper. It is said by appellees that the bill fails to show that the President declined or refused to order the return of the property and that a showing to this effect is jurisdictional. But as to this, we think that the statutory procedure which Congress provided, and which appellant adopted, is in all material respects shown to have been complied with. Enough appears to show unmistakably that there was a refusal by the President to deliver the property on demand. For these reasons, we adhere to our former decision.