260 F.2d 793
 H. B. DEAL, M. M. Glucksman and J. A. Laughren, Statutory Trustees of Lucas-Hunt Village, Inc., a Corporation (Plaintiffs) Appellants,
v.
FEDERAL HOUSING ADMINISTRATION (Defendant) Appellee.
THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, a Corporation (Intervenor) Appellant,
v.
FEDERAL HOUSING ADMINISTRATION (Defendant) Appellee.
 No. 15893.
 No. 15894.
 United States Court of Appeals Eighth Circuit.
 October 28, 1958.
 
 Leo F. Laughren, St. Louis, Mo., for appellants, H. B. Deal, M. M. Glucksman and J. A. Laughren.
 Thomas Rowe Schwarz, St. Louis, Mo. (Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., on the brief), for appellant, The Northwestern Mutual Life Insurance Company.
 Lionel Kestenbaum, Atty., Department of Justice, Washington, D. C. (Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Harry Richards, U. S. Atty., St. Louis, Mo., and Morton Hollander, Atty., Department of Justice, Washington, D. C., on the brief), for appellee.
 Before SANBORN, JOHNSEN, and VAN OOSTERHOUT, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 Plaintiffs[1] have appealed from judgment dismissing their claim for an accounting from the defendant, Federal Housing Administration (FHA), and granting judgment on defendant's counterclaim for a deficiency due on the mortgage debt. Intervenor, Northwestern Mutual Life Insurance Co. (Northwestern), has appealed from judgment denying its claim for the unpaid balance of $13,122.16 allegedly due upon a certificate of claim issued to it pursuant to the National Housing Act. Jurisdiction existed in the trial court by virtue of 28 U.S.C.A. § 1331, and 12 U.S.C.A. § 1702.
 
 
 2
 This case was tried to the court without a jury. Most of the material facts are stipulated. On November 25, 1938, Lucas-Hunt Village, Inc. (Lucas-Hunt), received from the Federal Housing Administration a commitment for insurance by which the FHA agreed to insure a mortgage upon real estate of Lucas-Hunt and a multiple housing project to be erected thereon for $2,700,000 upon commitment of a satisfactory mortgagee to lend a like amount. On January 19, 1939, Lucas-Hunt, Northwestern, and FHA entered into a building loan agreement providing for the erection and financing of the project here involved. The project was completed in February 1940. The building loan agreement was fully performed by all parties.
 
 
 3
 Lucas-Hunt on January 19, 1939, executed and delivered to Northwestern its note and mortgage for $2,700,000, and FHA delivered to Northwestern its contract insuring said mortgage. Lucas-Hunt defaulted in 1940 on payments due on its note. Northwestern exercised the rights granted it under the mortgage papers, and acquired fee simple title to the mortgaged property by foreclosure on July 8, 1940, by bidding in said property at foreclosure sale for $2,450,000, leaving a deficiency on the note of $219,472.55. Northwestern then conveyed the fee simple title and assigned the deficiency claim to FHA in return for FHA's fulfillment of its insurance obligation. Northwestern received $2,700,600 in debentures, which subsequently were paid in full, and a certificate of claim for the amount of $41,194.15. Section 207(h) of the National Housing Act, 12 U.S.C.A. § 1713(h), pursuant to which the certificate of claim was issued, and the certificate itself provide that the certificate holder's recovery shall be limited to the excess of receipts remaining at the time of liquidation in the project account above authorized deductions and expenditures. FHA operated the project until September 1942, at which time the property was sold to a purchaser on contract. The purchaser made its final payment in November 1950, thus terminating and liquidating FHA's interest in the project. Thereupon FHA sent Northwestern a statement of settlement, set out below,[2] which showed $28,071.99 available for payment on Northwestern's certificate of claim. In December 1950 Northwestern filed a verified claim for the foregoing balance, and made assignment of its certificate of claim as follows:
 
 
 4
 "For value received, The Northwestern Mutual Life Insurance Company hereby sell(s), assign(s), and transfer(s) unto Federal Housing Administration all of the right, title, and interest of the undersigned in and to the within Certificate of Claim. [Duly executed.]"
 
 
 5
 Northwestern was then paid $28,071.99, and the certificate, together with the assignment thereof, was delivered to FHA. This payment wiped out the credit balance in the project account on FHA's books.
 
 
 6
 This action was commenced in 1955. Appellants claim that FHA's accounting procedure for funds belonging to this project was not in accord with the applicable statutes, and that proper accounting would have shown a much larger credit balance in the project account. Appellants' principal complaints are that debenture interest was charged the account after the debentures were paid, and that the account was not credited with interest earned by principal payments made by FHA's vendee. FHA insists that its accounting procedure was proper and in conformity with law. We shall not set out the evidence bearing upon the propriety of the accounting, nor do we express any opinion on the merits of this issue, since we are of the opinion that none of the appellants is in a position to object to the accounting procedure for the reasons hereinafter set out.
 
 
 7
 From this point on, it is necessary to separately consider the appeals of the plaintiffs and Northwestern, as separate and distinct defenses are asserted as to their respective claims.
 
 
 8
 Plaintiffs contend that they are entitled to any excess that might be established by an accounting by virtue of the provisions of section 207(h) of the National Housing Act which provided:
 
 
 9
 "(h) * * * If the net amount realized from the mortgage, and all claims in connection therewith, so assigned, transferred, and delivered, and from the property covered by such mortgage and all claims in connection with such property, after deducting all expenses incurred by the Administrator in handling, dealing with, acquiring title to, and disposing of such mortgage and property and in collecting such claims, exceeds the face value of the debentures issued and the cash adjustment paid to the mortgagee plus all interest paid on such debentures, such excess shall be divided as follows:
 
 
 10
 "(1) If such excess is greater than the total amount payable under the certificate of claim issued in connection with such property, the Administrator shall pay to the holder of such certificate the full amount so payable, and any excess remaining thereafter shall be paid to the mortgagor of such property * *." [Emphasis supplied.]
 
 
 11
 The foregoing states the law as it was at the time the mortgage was insured and at the time of the default and the foreclosure and the conveyance of the property to the FHA by Northwestern. In 1948, the italicized words of the Act just quoted, to wit "paid to the mortgagor of such property" were eliminated, and the following words were substituted, "retained by the Administrator and credited to the Housing Insurance Fund." Section 101(p) of the Housing Act of 1948, 62 Stat. 1268, 1274. If the statute as amended governs, it is absolutely clear that the plaintiffs have no interest in the credits to the project account.
 
 
 12
 The trial court held that the FHA did not enter into any contractual obligation to pay the plaintiffs the project excess, that the former statutory provision for payment of the excess to the mortgagor was a gratuity, and that the amended statute terminated any right plaintiffs might have had to the excess. Plaintiffs first urge that the FHA entered into a contractual obligation to pay plaintiffs the excess. A reading of the contract convinces us that the trial court correctly determined that the FHA had assumed no such contractual obligation. The only contractual obligation the FHA assumed was to insure the mortgage. It fully performed this obligation. The parties to the insurance contract were FHA and Northwestern. The note and mortgage that were insured were entered into by Lucas-Hunt and Northwestern. The mortgage was foreclosed by Northwestern, and thereby Lucas-Hunt was completely divested of all interest in the mortgaged property. The FHA obtained the full title to the property by deed from Northwestern.
 
 
 13
 Plaintiffs contend that even if FHA made no express contract to pay the excess such a contract will be implied because the statute became part of the contract. Plaintiffs cite some language from Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434, to the effect that a contract may be found partly in the contract and partly in the statute. Under appropriate circumstances, such as appear in the Lynch case, this may be entirely true. In that case a valid war risk policy was issued pursuant to statutory authorization. The premiums had been paid. The policy provided that it was subject to the provisions of the statute and regulations. We find no similar language or circumstances in the present case. In the Lynch case the Court found that the Government by issuing the insurance policy had entered into a valid contract with its insured and that since the insured veteran had died while the contract was in force and before the repealing act, the beneficiary's rights had vested and could not be constitutionally withdrawn. Deutsche Bank und Disconto-Gesellschaft v. Cummings, 65 App. D.C. 297, 83 F.2d 554, relied upon by plaintiffs, does not aid them as this case was reversed by the Supreme Court. Cummings v. Deutsche Bank, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545.
 
 
 14
 Plaintiffs next urge that Lucas-Hunt by engaging in this project was entitled to the benefit of the provisions of the then existing law, and that Lucas-Hunt was induced by the law to enter into the building project.
 
 
 15
 Plaintiffs rely upon such cases as Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111; Texas & Pacific Ry. Co. v. United States, 286 U.S. 285, 52 S.Ct. 528, 76 L.Ed. 1108, and Burke v. Southern Pacific R. Co., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527. These cases are readily distinguishable on their facts from our present situation. In the Burke case it is clear that the granting act was enacted to induce the railroad to lay tracks. Consequently, the benefits conferred by the act were not a gratuity. The railroad upon complying with the conditions of the act obtained a vested interest in the rights granted. The Court found that the legislation in the Continental Tie & Lumber Co. case and the Texas & Pacific Ry. Co. cases was enacted during war time to induce small railroads not taken over by the Government to continue operations. Upon performance of the conditions imposed by statute, the railroads had a vested right in the benefits created by the act. Plaintiffs argue that the purpose of the Housing Act was to stimulate the building trade and to increase employment, citing United States v. Emory, 314 U.S. 423, 62 S.Ct. 317, 86 L. Ed. 315. The Court in the Emory case states (314 U.S. at page 433, 62 S.Ct. at page 322):
 
 
 16
 "* * * The purpose of Title I was not the strengthening of the general credit of property owners, but the stimulation of the building trades by affording assurances to lending institutions in order to induce them to make loans for property improvements. * * *"
 
 
 17
 The legislative history of the act also indicates that the primary purpose was to provide builders with financing. Mr. Marriner S. Eccles, Assistant to the Secretary of the Treasury, testifying before the House Committee on Banking and Currency, stated:
 
 
 18
 "* * * There is hardly a section of this country but what there are excess funds not working — not working, first, because the banks won't take the risks involved and, secondly, because there is no adequate form of credit available on a sufficiently attractive basis over a period of time to induce borrowers to use that credit.
 
 
 19
 "It seems to me that if through this program we can induce existing agencies, wherever they may be, to extend credit on a basis outlined in this program to people in the communities who are in need of that credit, a very constructive thing is done toward unchanneling those funds directly into the field of employment where they are needed. * * *"
 
 
 20
 While the opinion of Congress as to construction of the prior statute at the time it enacted the 1948 amendment is not controlling upon the interpretation of the prior act, the construction then placed by Congress on the original act is consistent with the interpretation that we reach of such act.[3] It would seem that the object of the housing legislation was to make credit available to borrowers through the insurance program. The purpose of the legislation was to attract loans to finance builders rather than to subsidize the builders.
 
 
 21
 The proper test for determining whether a law is intended to create private contractual or vested rights is stated in Dodge v. Board of Education of Chicago, 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57. In that case a prior law provided an annuity of $1,500 for teachers upon retirement who meet certain prescribed conditions. In 1935 the law was amended, reducing the annuity to $500. The Court held that teachers who had qualified for the annuity prior to the 1935 amendment had no vested or contractual rights to have such annuity maintained, and that the act reducing the amount of the annuity was not unconstitutional. The Court states (302 U.S. at pages 78, 79, 58 S.Ct. at page 100):
 
 
 22
 "In determining whether a law tenders a contract to a citizen, it is of first importance to examine the language of the statute. * * * The presumption is that such a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the Legislature shall ordain otherwise. He who asserts the creation of a contract with the state in such a case has the burden of overcoming the presumption. If, upon a construction of the statute, it is found that the payments are gratuities, involving no agreement of the parties, the grant of them creates no vested right."
 
 
 23
 In Pennie v. Reis, 132 U.S. 464, 10 S.Ct. 149, 33 L.Ed. 426, the suit was for recovery of a $1,000 insurance death benefit provided by law for San Francisco policemen. The law was repealed before the claimant's death. The Court, in upholding the constitutionality of the repealing law, states (132 U.S. at page 471, 10 S.Ct. at page 151):
 
 
 24
 "* * * The direction of the state that the fund should be one for the benefit of the police officer or his representative, under certain conditions, was subject to change or revocation at any time, at the will of the legislature. There was no contract on the part of the state that its disposition should always continue as originally provided. Until the particular event should happen upon which the money, or a part of it, was to be paid, there was no vested right in the officer to such payment. His interest in the fund was until then, a mere expectancy created by the law, and liable to be revoked or destroyed by the same authority. * * *"
 
 
 25
 In Cummings v. Deutsche Bank, supra, the Supreme Court held that the privilege of becoming re-entitled to seized property, extended to former enemy owners upon specified conditions by the Settlement of War Claims Act, 45 Stat. 254, was a matter of grace and was subject to withdrawal by Congress. In Wisconsin & Michigan Ry. Co. v. Powers, 191 U.S. 379, 24 S.Ct. 107, 48 L.Ed. 229, a Michigan statute provided for certain tax exemptions for ten years to railroads building in certain locations. Plaintiff built a railroad at the place prescribed. Later, the act providing for the tax exemption was modified, and plaintiff sought to enjoin the tax upon the basis that the imposition of tax abrogated vested contractual rights. The Court held that there were no contractual rights to the exemption, stating (191 U.S. at page 387, 24 S.Ct. at page 108):
 
 
 26
 "* * * The broad ground in a case like this is that, in view of the subject-matter, the legislature is not making promises, but framing a scheme of public revenue and public improvement. In announcing its policy, and providing for carrying it out it may open a chance for benefits to those who comply with its conditions, but it does not address them, and therefor, it makes no promise to them. It simply indicates a course of conduct to be pursued, until circumstances or its views of policy change. It would be quite intolerable if parties not expressly addressed were to be allowed to set up a contract on the strength of their interest in, and action on the faith of, a statute, merely because their interest was obvious and their action likely, on the face of the law. * *"
 
 
 27
 We believe that the reasoning of the cases just discussed is controlling here. We agree with the trial court that Lucas-Hunt had no contractual or vested right to the project excess. Under the statute as it existed at the time the mortgage was given, plaintiffs did not in any event obtain a vested right to the excess prior to the time of final liquidation of the project, which did not occur until 1950.
 
 
 28
 Plaintiffs also contend that they are entitled to the provisions of the original act because such rights are preserved by the General Savings Statute, 1 U.S. C.A. § 109, which provides, "the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute * * *." The problem here is whether under the prior statute the rights plaintiffs here claim constituted a "liability incurred."
 
 
 29
 In National Labor Relations Board v. National Garment Co., 8 Cir., 166 F.2d 233, 237, this court stated:
 
 
 30
 "`The term "liability" as used in the general savings statute has been broadly construed by the courts to comprehend all obligations arising out of any breach of a statutory duty. * * *'"
 
 
 31
 In 42 C.J.S. at page 553, with reference to the word "incur" it is stated, "The word refers to an existing or present liability, not to a liability due in the future; and to a completed state of things rather than to an inchoate condition." With reference to "incurred" it is stated, "It is a word denoting the past tense, and defined as meaning became liable for * * *." In The Princess of Orange, D.C.N.Y., 19 Fed.Cas. page 1336 No. 11,431, it is stated:
 
 
 32
 "Neither in legal phrase, nor common parlance, is the word `incur' used to signify an inchoate or incomplete condition. It has reference to a state of things already passed and fulfilled. To incur a debt, or incur a responsibility, or incur loss, etc., is to have become absolutely liable in that behalf."
 
 
 33
 Hertz v. Woodman, 218 U.S. 205, 30 S.Ct. 621, 54 L.Ed. 1001, discusses the "liability incurred" feature of the general savings statute. The Court held that the obligation to pay an estate tax rises upon testator's death, which occurred prior to the repeal of the taxing statute, and that hence the tax was due under the general savings statute. In all cases coming to our attention which have applied the statute, the event imposing liability had occurred before the repeal or the amendment. See Allen v. Grand Central Aircraft Co., 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (unlawful wage payments); De La Rama S. S. Co. v. United States, 344 U.S. 386, 73 S.Ct. 381, 97 L.Ed. 422 (sinking of ship covered by war risk policy); National Labor Relations Board v. National Garment Co., supra (unfair labor practice).
 
 
 34
 The important question here is to determine when liability was incurred under the housing statute. Plaintiffs state that the liability was incurred when the FHA acquired the property in 1940. Plaintiffs' contention is demonstrably erroneous. The original act provided for payment of the excess only upon complete liquidation. Lucas-Hunt, by virtue of foreclosure in 1940, lost all right, title, and interest in the mortgaged property. It had no voice in determining when the property was to be sold, the sale price or terms. Up to the date the FHA's vendee completed its payments, there was no certainty that any excess would ever exist over the investment and authorized expenditures. The amount of the excess, if any, could be determined only after complete liquidation of the mortgaged property. Under the undisputed evidence the liquidation was not completed until 1950, at which time the statutory provisions upon which plaintiffs rely had been eliminated by the 1948 amendment. FHA had incurred no liability to Lucas-Hunt prior to the adoption of the 1948 amendment, and consequently the general savings statute is inapplicable.
 
 
 35
 Plaintiffs' contention that the court erred in entering judgment for the FHA for the unpaid balance of the mortgage debt is wholly without merit. Lucas-Hunt's note and mortgage were in the ordinary form and contained no restriction or limitation upon its liability for its debt. The deficiency remained after crediting Lucas-Hunt with the foreclosure bid. The fact that Northwestern in fulfillment of FHA's insurance contract received full payment for its investment in exchange for its deed to the foreclosed property and the assignment of the deficiency can in no way operate to discharge the mortgagor's indebtedness for the deficiency. The insurance contract was for the protection of the lender. Neither the insurance contract nor the statute contained any provision limiting or extinguishing the liability of the mortgagor. There is no evidence in the record to support plaintiffs' claim of non-liability. Upon plaintiffs' appeal, the judgment is affirmed.
 
 
 36
 We now consider Northwestern's appeal. The trial court, among other things, determined that an accord and satisfaction was consummated when Northwestern accepted $28,071.99 in full satisfaction of its claim, and further held that Northwestern by assigning its claim to FHA for a valuable consideration was barred from prosecuting the claim. If the court is correct upon either of these determinations, the dismissal of Northwestern's claim must be affirmed. Northwestern claims that there is no consideration to support the accord and satisfaction, and relies upon the rule that an agreement to take less than what is owing is a compact without consideration. The Supreme Court in Chicago, Milwaukee & St. Paul Railway Co. v. Clark, 178 U.S. 353, 365, 20 S.Ct. 924, 44 L.Ed. 1099, considers the rule urged and states:
 
 
 37
 "The result of the modern cases is that the rule only applies when the larger sum is liquidated, and when there is no consideration whatever for the surrender of part of it; and while the general rule must be regarded as well settled, it is considered so far with disfavor as to be confined strictly to cases within it."
 
 
 38
 In the case just cited a contractor brought suit for certain items he claimed were due and unpaid. The Court held that such items were included in the accord and satisfaction of his principal claim. The Court states (178 U.S. at pages 367-369, 20 S.Ct. at page 928):
 
 
 39
 "And the cases are many in which it has been held that where an aggregate amount is in dispute, the payment of a specified sum conceded to be due, that is, by including certain items but excluding disputed items, on condition that the sum so paid shall be received in full satisfaction, will be sustained as an extinguishment of the whole.
 
 
 40
 * * * * * *
 
 
 41
 "Without analyzing the cases, it should be added that it has been frequently ruled by this court that a receipt in full must be regarded as an acquittance in bar of any further demand in the absence of any allegation and evidence that it was given in ignorance of its purport, or in circumstances constituting duress, fraud, or mistake. * * *"
 
 
 42
 In our present case Northwestern's claim was not liquidated. While the certificate was for a definite amount, the certificate itself and the authorizing statute specifically provide that payment is to be made only upon final liquidation, and then, only to the extent of the excess, if any, available from the proceeds of the transferred property remaining after payment of authorized expenses, debentures, and interest. Whether any payment would be due on the certificate depended entirely upon whether there would be an excess. After final liquidation the FHA prepared and sent to Northwestern the statement, set out in footnote 2, showing an excess of $28,071.99. Payment of this amount was tendered as a complete settlement of FHA's liability upon the certificate. Northwestern accepted said statement without protest, filed claim for such amount, and received payment therefor and assigned the certificate to FHA. Northwestern's claim was one indivisible claim based upon its certificate. The amount of excess funds in the project had to be established to determine the amount due Northwestern. The correctness of the determination of the excess was dependent upon the correctness of the statement as a whole. Among the cases supporting our view that an accord and satisfaction has here been consummated are: Oregon-Washington R. & Nav. Co. v. United States, 255 U.S. 339, 41 S.Ct. 329, 65 L.Ed. 677; De Arnaud v. United States, 151 U.S. 483, 14 S.Ct. 374, 38 L.Ed. 244; Murphy v. United States, 104 U.S. 464, 26 L.Ed. 833; Baird v. United States 96 U.S. 430, 24 L.Ed. 703; Savage v. United States, 92 U.S. 382, 23 L.Ed. 660.
 
 
 43
 Northwestern further contends that the accord and satisfaction is not binding because it was entered into by mutual mistake of fact and by reason of fraudulent misrepresentations by FHA. It relies upon Road Improvement District No. 4 of Conway County, Arkansas v. Wilkerson, 8 Cir., 5 F.2d 416, and other cases to support its contention. It is doubtless true that under appropriate circumstances a settlement can be avoided by reason of a mutual mistake of fact or fraud. In our present case the trial court in its findings of fact and conclusions of law stated:
 
 
 44
 "8. There was no fraud or mistake of fact or of law which would serve as a basis for setting aside the settlement arrived at by and between FHA and the Intervenor."
 
 
 45
 We do not believe that it can be said upon this record that such determination is clearly erroneous.
 
 
 46
 The principal complaint is that FHA charged interest on debentures after they were paid. Northwestern owned all of these debentures and knew that they were paid in 1945 and 1946. The statement submitted showed that debenture interest was charged from 6-14-40 to 11-14-50 and the amount thereof. There is a legal question which we do not here reach whether such interest was properly charged. In Baird v. United States, supra, a contractor entitled by contract to compensation for advance in his costs filed a claim for such advanced costs. Upon audit it was allowed in a lesser amount with reasons assigned for the reduction, and settlement was completed upon the reduced basis. Thereafter, claimant brought action to recover for the part of the claim disallowed. Relief was denied although the Court of Claims found that the claimant had actually paid excess costs in the amount claimed. The Supreme Court states (96 U.S. at pages 431-432):
 
 
 47
 "* * * Under such circumstances, it was the duty of the auditing officers of the government to state the amount themselves before making payment. This they did, and reported to the claimant the amount found due, with the principles upon which the adjustment had been made. In effect, this was an offer to pay the balance stated in satisfaction of the claim. The acceptance of the money afterwards, without objection, was equivalent to an acceptance of the payment in satisfaction."
 
 
 48
 See also Oregon-Washington R. & Nav. Co. v. United States, supra.
 
 
 49
 The certificate involved in this case contains the following language:
 
 
 50
 "The determination of the Administrator regarding the amount, if any, to be paid the holder of this Certificate of Claim shall be final and conclusive upon all parties interested. * * * nor shall the Administrator owe any duty to any mortgagee or mortgagor, or holder of a certificate of Claim with respect to the handling or disposal of any such property, or the collection of any such claim."
 
 
 51
 Northwestern's claim is based upon its certificate. There is a serious doubt whether Northwestern is in a position to question the accounting.
 
 
 52
 There is no evidence by Northwestern to show that it was misled by the accounting. It is not unreasonable to assume that Northwestern's officials were competent to analyze the statement submitted. Without discussing the evidence in further detail, we conclude that the court committed no error in its determination that no fraud or mistake of fact, such as would void the accord and satisfaction, has been established.
 
 
 53
 The court's determination that recovery is barred by Northwestern's assignment of the certificate to FHA for a valid consideration also appears to be supported by substantial evidence.
 
 
 54
 The judgment appealed from by plaintiffs and Northwestern is affirmed in all respects.
 
 
 
 Notes:
 
 
 [1]
 Plaintiffs are the trustees of Lucas-Hunt Village, Inc., a dissolved corporation, acting under appointment by the Circuit Court of the City of St. Louis, Missouri. Such trustees have full power to collect any claim due the corporation
 
 
 [2]
 
 Statement of Settlement

 Proceeds:

 Net Sales Price ................................................ $2,796,619.94

 Income:

 Rent .............................................. $519,234.13
 Other ............................................. 1,133.71
 Mortgage Note Interest ............................ 637,871.16 1,158,239.00
 ____________ _____________
 Total Income ................................................. $3,954,858.94

 Expenses:

 Debentures ........................................ $2,700,600.00
 Cash Adjustment ................................... 20.66
 Preferred Stock Written Off ....................... 100.00
 Debenture Interest, 6-14-40 to 11-14-50 ........... 773,781.58
 Misc. Taxes and Insurance ......................... 84,742.61
 Additions to Fixed Assets ......................... 35,552.40
 Administrative Expense ............................ 28,269.43
 Financial Expense ................................. 64.50
 Maintenance Expense ............................... 113,212.73
 Hazard Insurance .................................. 41,196.45
 Operating Expense ................................. 108,690.79
 Personal Property Acquired ........................ 14,423.29
 Renting Expense ................................... 19,646.80
 Settlement Expense ................................ 6,485.71
 _____________
 Total Expense ................................................. $3,926,786.95
 _____________
 Excess of Income Over Expense ..................................... $ 28,071.99

 Amount available for payment of:
 Certificate of claim ............................................ $ 28,071.99
 Increment on certificate of claim ............................... --0--
 
 
 [3]
 The Senate Report accompanying the 1948 amendment reads in part: "This section * * * eliminates the present statutory requirement that where FHA takes over a rental housing project as a result of default of the mortgagor and, through its efforts, ultimately realizes a profit on the transaction, such profit must be turned over to the mortgagor. It is not believed that the defaulting mortgagor corporation is entitled to such a gratuity but that such profit, if any, should accrue to the insurance fund to offset losses incurred in other cases."