ALLEN, CHAIRMAN, TWELFTH REGION WAGE
STABILIZATION BOARD, ET AL. v. GRAND
CENTRAL AIRCRAFT CO.

No. 450.   Argued March 11–12, 1954.—Decided May 24, 1954.

*Robert L. Stern* argued the cause for appellants. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Burger, Samuel D. Slade, Herman Marcuse* and *Charles H. Kendall.*

*Richard W. Lund* argued the cause for appellee. With him on the brief were *Dana Latham* and *Paul R. Watkins.*

Mr. Justice Burton delivered the opinion of the Court.

The principal question for decision is whether the Defense Production Act of 1950 [1] authorized the President

---

[1] 64 Stat. 798, as amended, 65 Stat. 131, 66 Stat. 296, 67 Stat. 129, 50 U. S. C. App. (1946 ed., Supp. V) § 2061 *et seq.*

to apply administrative action to the enforcement of its wage stabilization provisions. For the reasons hereafter stated, we decide that it did.

There is here also the question whether such administrative enforcement may be applied even after the restrictions placed on wages under Title IV of the Act [2] have expired, provided the enforcement is limited to violations antedating such expiration. Our answer is in the affirmative.

Appellee further claims that the pending administrative proceeding should be enjoined because the mere conduct of that proceeding might cause it irreparable damage. For the reasons given below, we find that argument untenable.

Appellee, Grand Central Aircraft Company, is a California corporation which was engaged, in 1951, in the production and repair of aircraft equipment in Glendale, California, and Tucson, Arizona. November 4, 1952, the Wage Stabilization Board [3] filed a complaint with the National Enforcement Commission [4] alleging in substance that appellee, between January 26, 1951, and January 1, 1952, had paid wage increases in violation of an order freezing wages at the levels of January 25, 1951. [5] Those payments consisted of wages totaling about $5,500,000, including about $750,000 alleged to have been in excess

---

[2] "TITLE IV—PRICE AND WAGE STABILIZATION" containing §§ 401–412, 64 Stat. 803–812, 66 Stat. 304, and see 50 U. S. C. App. (1946 ed., Supp. V) §§ 2101–2110.

[3] Created, within the Economic Stabilization Agency, by § 403 (b) of the Defense Production Act, June 30, 1952, 66 Stat. 300–301. See also, Exec. Order No. 10377, 17 Fed. Reg. 6891; ESA Gen. Order No. 16, 17 Fed. Reg. 6925.

[4] ESA Gen. Order No. 18, effective July 30, 1952, 17 Fed. Reg. 6925, as amended at 9977, established NEC within the ESA and defined the functions of NEC.

[5] Gen. Wage Stabilization Regulation 1, issued by Economic Stabilization Administrator, January 26, 1951, 16 Fed. Reg. 816.

of the wage ceilings. January 14, 1953, the National Enforcement Commission appointed Phil C. Neal to hear the evidence as an Enforcement Commissioner and to recommend to the Commission a determination of the issues in the proceeding. He set the case for hearing on February 24 at Los Angeles, California, but further action was enjoined, as stated below, so that the proceeding is still pending at that stage.[6]

February 13, 1953, appellee filed the instant suit in the United States District Court for the Northern District of California, Southern Division. Appellee asked the court to restrain the defendant members of the Wage Stabilization Board, the National Enforcement Commission, officials of the Twelfth Region Wage Stabilization Board, and the Enforcement Commissioner, from proceeding with the administrative hearing. Only the regional officials and the Enforcement Commissioner were served. In its complaint, appellee denied that it had violated the Defense Production Act or any regulation or order under it. Appellee claimed also that the administrative procedure then being followed was unauthorized by the Constitution or any statute and that, even if originally authorized, that authorization had now expired. Finally, appellee claimed the hearing should be enjoined because the mere conduct of the proceeding would inflict irreparable damage upon it. A three-judge District Court, convened under 28 U. S. C. (1952 ed.) § 2282, granted the restraining order and interlocutory injunction sought by appellee against further conduct of the administrative proceeding. After hearing and trial, the injunction was made permanent. 114 F. Supp. 389. The

---

[6] The Government states that Neal, who is one of the appellants, is now on the staff of the Office of Defense Mobilization and is authorized and ready to conduct the hearing if the injunction is lifted.

order was then appealed to this Court under 28 U. S. C. (1952 ed.) § 1253. Stay of the injunction was denied, two Justices dissenting and one not participating. 345 U. S. 988. Probable jurisdiction of the appeal was noted. 346 U. S. 920.

A somewhat comparable case was decided by a three-judge United States District Court for the Northern District of Texas in favor of an employer June 14, 1953, in *Jonco Aircraft Corp.* v. *Franklin,* 114 F. Supp. 392, with Chief Circuit Judge Hutcheson dissenting. That judgment was reversed by this Court, *per curiam,* for failure of appellee to exhaust its administrative remedy. 346 U. S. 868.

## I.

We consider first the claim to injunctive relief which appellee made on the ground that the conduct of the proposed administrative hearings would cause it irreparable damage by weakening its bank credit and depriving it of essential working capital. On that basis, interlocutory relief was granted pending the court's determination of the ultimate issue of the validity of the administrative procedure. That injunction has been made permanent but the Government, on behalf of appellants, contends that appellee is acting prematurely in seeking such relief before carrying the prescribed administrative procedure at least to the point where it faces some immediate compulsion and greater probability of damage than it has established.

The proposed hearings are to be held before an Enforcement Commissioner with authority merely to recommend findings to a Regional Enforcement Commission subject to review by the National Enforcement Commission. Those findings may show no violation of wage ceilings. At most, they will be concerned with appellee's

alleged payment of wages in excess of wage ceilings to an extent of about $750,000. If such a violation of the ceilings is found by the National Enforcement Commission, it may then, under § 405 (b) of the Defense Production Act of 1950 and the President's delegated authority, certify to governmental agencies, including the Bureau of Internal Revenue for income-tax purposes, the disallowance of all or part of appellee's illegal wage payments. Appellee argues that such proceedings carry the possibility of the disallowance as a business expense, for income-tax purposes, of $750,000, more or less, up to the total wages paid, exceeding $5,500,000. Appellee contends also that the mere threat of such action would jeopardize the bank credit upon which it depends for essential working capital. There is grave doubt of the right of appellee thus to test the validity of administrative procedure before exhausting it or bringing the issues closer to a focus than it has done. However, it is clear that once the right of the Government to hold administrative hearings is established, a litigant cannot enjoin them merely because they might jeopardize his bank credit or otherwise be inconvenient or embarrassing. *Aircraft & Diesel Corp.* v. *Hirsch*, 331 U. S. 752, 777–779. "[T]he expense and annoyance of litigation is 'part of the social burden of living under government.'" *Petroleum Exploration, Inc.* v. *Public Service Commission*, 304 U. S. 209, 222. See also, *Myers* v. *Bethlehem Corp.*, 303 U. S. 41, 47; *Chicago & Southern Air Lines* v. *Waterman Corp.*, 333 U. S. 103, 112–113; *Franklin* v. *Jonco Aircraft Corp.*, per curiam, 346 U. S. 868.

It is appellee's principal claim that there is no properly authorized administrative procedure for it to exhaust and that the administrative authorities who seek to determine its case have no lawful right to do so. We, therefore, go directly to the heart of this controversy, which is the

question whether the administrative enforcement of the 1950 wage stabilization program has been validly authorized.

## II.

The procedure in question is prescribed by General Procedural Regulation 1, Revised, issued by the Economic Stabilization Administrator, August 21, 1952, 17 Fed. Reg. 7737. The hearings are to be conducted regionally by an Enforcement Commissioner and provision is made for appeal to the National Enforcement Commission. That Commission (NEC) is authorized to issue a certificate of disallowance prescribing the amount of wages to be disregarded by the executive departments and other governmental agencies in determining the costs and expenses of appellee for the purposes of any other law or regulation. ESA Gen. Order No. 18, July 28, 1952, 17 Fed. Reg. 6925. Standards of action are prescribed by the Economic Stabilization Administrator in his General Order No. 15, April 3, 1952, 17 Fed. Reg. 2994. Appellee does not complain of noncompliance with these regulations. It complains rather that they are not authorized by statute or that, if purporting to be so authorized, the statute violates the Federal Constitution.

The Government finds authority for the creation of this administrative machinery in § 405 (b) of the Defense Production Act of 1950, when read in connection with the entire Act. That section is derived from § 5 (a) of the Stabilization Act of 1942, 56 Stat. 767, 50 U. S. C. App. (1946 ed.) § 965 (a). To read the Defense Production Act of 1950 without reference to this model is to read it out of the context in which Congress enacted it.

The Stabilization Act of 1942 was a vital wartime measure, adopted October 2, 1942, directing the President "on or before November 1, 1942, to issue a general order stabilizing prices, wages, and salaries, affecting the cost

of living." [7]   In it, Congress relied upon presidential
action geared to the critical necessity for speedy com-
pliance.   Its purpose was to check inflation.   It subor-
dinated individual convenience to nationwide standards.
Its sanctions were entrusted to administrative agencies
capable of prompt action.   Section 5 (a) provided that—

> "No employer shall pay, and no employee shall
> receive, wages or salaries in contravention of the
> regulations promulgated by the President under this
> Act.   The President shall also prescribe the extent
> to which any wage or salary payment made in con-
> travention of such regulations shall be disregarded
> by the executive departments and other govern-
> mental agencies in determining the costs or expenses
> of any employer for the purposes of any other law
> or regulation."   56 Stat. 767, 50 U. S. C. App. (1946
> ed.) § 965 (a).

The Act granted the President broad powers to pro-
mulgate regulations.[8]   October 3, 1942, he issued Execu-
tive Order No. 9250, 7 Fed. Reg. 7871, "to control so far
as possible the inflationary tendencies and the vast dis-

---

[7] 56 Stat. 765, 50 U. S. C. App. (1946 ed.) § 961 et seq.   The
Stabilization Act itself was an amendment to the Emergency Price
Control Act of 1942, approved January 30, 1942, 56 Stat. 23, 50
U. S. C. App. (1946 ed.) § 901 et seq.   For its title, see 58 Stat. 643.
It was temporary legislation.   Its termination date was June 30,
1944, or "such earlier date as the Congress by concurrent resolution,
or the President by proclamation, may prescribe."   56 Stat. 767.
That date was postponed, one year at a time, to June 30, 1947.
58 Stat. 643, 59 Stat. 306, 60 Stat. 664, 50 U. S. C. App. (1946 ed.)
§ 966.

[8] "Sec. 2. The President may, from time to time, promulgate such
regulations as may be necessary and proper to carry out any of the
provisions of this Act; and may exercise any power or authority
conferred upon him by this Act through such department, agency,
or officer as he shall direct. . . ."   56 Stat. 765, 50 U. S. C. App.
(1946 ed.) § 962.

locations attendant thereon which threaten our military effort and our domestic economic structure, and for the more effective prosecution of the war." That order established an Office of Economic Stabilization, headed by an Economic Stabilization Director. In Title II it established a national "Wage and Salary Stabilization Policy." This placed wage rates under the control of the National War Labor Board and froze them generally at the levels prevailing September 15, 1942. In Title III it authorized the National War Labor Board to issue rules and regulations "for the speedy determination of the propriety of any wage increases or decreases in accordance with this Order." It thus established administrative processes for making specific determinations of wages paid in contravention of the Act. The same processes also enabled the Government, through other agencies, to disregard such illegal payments when computing taxes, compensation under cost-plus contracts and other governmental transactions.

October 27, 1942, James F. Byrnes, the Economic Stabilization Director, with the personal approval of the President, issued the regulations which later were to serve as the model for the regulations now before us.[9] They delegated to the National War Labor Board authority to certify, to all executive departments and other agencies of the Government, disallowances of payments of wages based upon the Board's determination of their violation of the Act.[10]

---

[9] Office of Economic Stabilization—Pt. 4001—Wages and Salaries, 7 Fed. Reg. 8748 *et seq.* Subsequent amendments did not change the provisions for making tax disallowances based upon specific administrative determinations.

[10] "§ 4001.2 *Authority of National War Labor Board.* The Board shall . . . have authority to determine whether any

"(a) Wage payments . . .

.  .  .  .  .

"are made in contravention of the Act, or any rulings, orders or regulations promulgated thereunder. Any such determination by the

July 30, 1943, the Board adopted rules to govern its procedures and those of Regional War Labor Boards in dealing with violation of the wage stabilization program. Those regulations likewise are comparable to the ones involved in this case.   9 Fed. Reg. 4681 *et seq.*

Nearly 100,000 proceedings were thus held and disallowances of nearly $30,000,000 were made up to February 24, 1947.[11]   Those proceedings were matters of general public knowledge and were well known to Congress.[12]

---

Board, made under rulings and orders issued by it, that a payment is in contravention of the Act, or any rulings, orders, or regulations promulgated thereunder, shall be conclusive upon all Executive Departments and agencies of the Government in determining the costs or expenses of any employer for the purpose of any law or regulation, either heretofore or hereafter enacted or promulgated, including the Emergency Price Control Act of 1942 or any maximum price regulation thereof, or for the purpose of calculating deductions under the revenue laws of the United States, or for the purpose of determining costs or expenses under any contract made by or on behalf of the United States.   Any determination of the Board made pursuant to the authority conferred on it shall be final and shall not be subject to review by The Tax Court of the United States or by any court in any civil proceedings."   7 Fed. Reg., at 8749.

[11] From October 3, 1942, to December 29, 1945, 68,233 cases, resulting in disallowances of $19,018,820.19, were handled by the National War Labor Board.   1 Termination Report, National War Labor Board, 428–441.   From January 1, 1946, to January 30, 1947, 30,071 cases, resulting in disallowances of $11,822,609, were handled by the National Wage Stabilization Board.   National Wage Stabilization Board (1946–1947) 223–235.   While many cases resulted in findings of no violation or were closed without penalty or disallowance, many others were terminated with disallowances, either by consent or after hearings.   There were 282 appeal cases processed by the National Boards, and although the controls were terminated in November 1946 by Executive Order No. 9801, 11 Fed. Reg. 13435, the enforcement activities, based on earlier violations, were carried on by the Department of the Treasury until 1949.   See Ann. Reps. of the Commissioner of Internal Revenue 62–63 (1947); 33–34 (1948); 26–27 (1949).

[12] Not only was the life of the Act extended three times (see note 7, *supra*) but its administration was reviewed during annual appropria-

They support the natural presumption that Congress, in its subsequent actions, accepted them as legitimate interpretations of the Stabilization Act. *Shapiro* v. *United States,* 335 U. S. 1, 16; *Helvering* v. *Winmill,* 305 U. S. 79, 82–83; *Norwegian Nitrogen Co.* v. *United States,* 288 U. S. 294, 310–315; *Hecht* v. *Malley,* 265 U. S. 144, 153.

Under the Act of 1942, the President thus determined, through his administrative agencies, many specific violations of the prescribed wage ceilings. It was the practice of those administrative agencies to certify to other departments and agencies specific disallowances of the wages paid in violation of such ceilings. See *Troy Laundry Co.* v. *Wirtz,* 155 F. 2d 53; *Woodworth Co.* v. *Kavanagh,* 102 F. Supp. 9, aff'd, 202 F. 2d 154.

A comparison of the terms of the Act of 1942 with those of the Defense Production Act of September 8, 1950, and a comparison of the regulations and practice under those Acts is impressive.

Section 405 (b) of the later Act is as follows:

> "No employer shall pay, and no employee shall receive, any wage, salary, or other compensation in contravention of any regulation or order promulgated by the President under this title. The President shall also prescribe the extent to which any wage, salary, or compensation payment made in contravention of any such regulation or order shall be disregarded by the executive departments and other governmental agencies in determining the costs or expenses of any employer for the purposes of any other law or regulation." 64 Stat. 807, 50 U. S. C. App. (1946 ed., Supp. V) § 2105 (b).

---

tion hearings. See Hearings before the House Subcommittee on Appropriations on National War Agencies Appropriation Bills for 1944, Pt. 2, 78th Cong., 1st Sess. 667–668; for 1945, Pt. 1, 78th Cong., 2d Sess. 240–241, 303–304; for 1946, 79th Cong., 1st Sess. 12–13.

It follows, almost word for word, the language of § 5 (a) of the earlier Act, *supra,* at p. 542. While it substitutes the phrase "any wage, salary, or other compensation" in place of "wages or salaries," and the phrase "any regulation or order" in place of "the regulations," the substance of the two sections is inescapably the same.

The Act of 1950 granted the President broad powers to make regulations under it and to delegate the authority conferred upon him by it.[13] His orders and regulations

---

[13] "SEC. 403. (a) At such time as the President determines that it is necessary to impose price and wage controls generally over a substantial portion of the national economy, he shall administer such controls . . . through a new independent agency created for such purpose: . . . . Such agency may utilize the services, information, and facilities of other agencies and departments of the Government, but such agency shall not delegate enforcement of any of the controls to be administered by it under this section to any other agency or department." 64 Stat. 807, as amended, 65 Stat. 137, 66 Stat. 300. See 50 U. S. C. App. (1946 ed., Supp. V) § 2103. (Delegations as to the enforcement of controls, accordingly, were made only to officials within the new independent agency known as the Economic Stabilization Agency.)

"SEC. 703. (a) Except as otherwise specifically provided, the President may delegate any power or authority conferred upon him by this Act to any officer or agency of the Government, including any new agency or agencies (and the President is hereby authorized to create such new agencies, other than corporate agencies, as he deems necessary), and he may authorize such redelegations by that officer or agency as the President may deem appropriate. . . ." 64 Stat. 816, 50 U. S. C. App. (1946 ed., Supp. V) § 2153 (a).

"SEC. 704. The President may make such rules, regulations, and orders as he deems necessary or appropriate to carry out the provisions of this Act. Any regulation or order under this Act may be established in such form and manner, may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions as in the judgment of the President are necessary or proper to effectuate the purposes of this Act, or to prevent circumvention or evasion, or to facilitate enforcement of this Act, or any rule, regulation, or order issued under this Act." 64 Stat. 816, see 50 U. S. C. App. (1946 ed., Supp. V) § 2154.

follow the pattern of the earlier ones. September 9, 1950, he issued Executive Order No. 10161, 15 Fed. Reg. 6105, 6106, Part IV of which created a new agency known as the Economic Stabilization Agency, headed by an Economic Stabilization Administrator. To him the President delegated responsibility for wage stabilization. He established, within such agency, a Wage Stabilization Board with functions to be determined by the Administrator. January 24, 1951, Eric Johnston, then the Administrator, delegated to that Board his functions of wage stabilization. ESA Gen. Order No. 3, 16 Fed. Reg. 739. January 26, he froze wages generally at the levels prevailing January 25. Gen. Wage Stabilization Regulation No. 1, 16 Fed. Reg. 816.

Enforcement under the Act of 1950 thus closely resembled enforcement under the Act of 1942. June 13, the Wage Stabilization Board established a National Enforcement Commission and authorized the establishment of Regional Enforcement Commissions. Such Commissions were authorized to make determinations of wage violations and the disallowances of specific wage payments under § 405 (b). Those determinations were to be "conclusive for the purpose therein stated. The executive departments and other agencies of the government which receive certifications of such determinations shall disregard and disallow the amount thus certified." WSB Enforcement Resolution No. 1, § 1 (c), 16 Fed. Reg. 6028, 6029. June 28, this procedure was further described in a resolution of the War Stabilization Board. 16 Fed. Reg. 7284.

April 3, 1952, the Economic Stabilization Administrator, in General Order No. 15, 17 Fed. Reg. 2994, prescribed the standards to be followed in making disallowances, including a recognition of extenuating and mitigating circumstances.

548

Effective July 30, 1952, § 403 (b) of the Act was amended to establish a new Wage Stabilization Board. 66 Stat. 300-301. Its functions were defined by the Economic Stabilization Administrator in ESA General Order No. 16, 17 Fed. Reg. 6925. On the same day, he issued ESA General Order No. 18, 17 Fed. Reg. 6925, defining the functions of the National Enforcement Commission. The order covered the Commission's authority to determine and certify specific disallowances in accordance with the standards prescribed in General Order No. 15, *supra*. The language and substance is obviously reminiscent of that under the Act of 1942.[14]

The legislative history confirms the parallel nature of the two programs. The occasion for the Act of 1950

---

[14] "SEC. 4. *Functions of the National Enforcement Commission.* (a) The functions of the National Enforcement Commission (hereinafter referred to as the Commission) shall be, with respect to persons within the jurisdiction of the Wage Stabilization Board, the Salary Stabilization Board and the Office of Salary Stabilization, and the Railroad and Airline Wage Board, to determine whether any wage, salary, or other compensation has been paid or accrued, at any time, in violation or contravention of any provision of the Defense Production Act of 1950, as amended, or any regulation or order or directive heretofore or hereafter promulgated under the act. Such determination shall be made by the Commission after any of the foregoing named constituent organizations of this Agency have instituted an enforcement proceeding before it or after any such organization has submitted a settlement proposal to the Commission for its approval. Such determination shall be final within the Economic Stabilization Agency.

"(b) The Commission is further authorized to certify and transmit such determinations in accordance with the policy and procedure set forth in Economic Stabilization Agency General Order No. 15, and other orders, directives, general policies or general regulations of the Economic Stabilization Administrator.

"SEC. 5. *Redelegation of authority.* (a) The authority delegated to the Economic Stabilization Administrator with respect to the imposition of disallowance sanctions under section 405 (b) of the Defense Production Act, as amended, for the violation or contraven-

was the recurring need to check inflation. The military demands in Korea and elsewhere in 1950 made it necessary to maintain a large production of military goods while seeking also to meet the long-denied and increasing needs of the Nation's civil economy. The 1950 Act expressly declared its purpose.[15] Congress reenacted, on a temporary basis, the emergency powers of the President which had been effective during World War II.[16]

---

tion of any provisions of, or any orders or any regulations issued under said act, as amended, relating to the payment of wages, salaries, or other compensation, is hereby redelegated to the Commission, in accordance with the functions described above." 17 Fed. Reg., at 6926.

[15] "Sec. 2. . . . The United States is determined to develop and maintain whatever military and economic strength is found to be necessary to carry out this purpose. Under present circumstances, this task requires diversion of certain materials and facilities from civilian use to military and related purposes. It requires expansion of productive facilities beyond the levels needed to meet the civilian demand. In order that this diversion and expansion may proceed at once, and that the national economy may be maintained with the maximum effectiveness and the least hardship, normal civilian production and purchases must be curtailed and redirected.

"It is the objective of this Act to provide the President with authority to accomplish these adjustments in the operation of the economy. It is the intention of the Congress that the President shall use the powers conferred by this Act to promote the national defense, by meeting, promptly and effectively, the requirements of military programs in support of our national security and foreign policy objectives, and by preventing undue strains and dislocations upon wages, prices, and production or distribution of materials for civilian use, within the framework, as far as practicable, of the American system of competitive enterprise." 64 Stat. 798, 799, 50 U. S. C. App. (1946 ed., Supp. V) § 2062.

See S. Rep. No. 2250, 81st Cong., 2d Sess. 4–5, 20–40.

[16] The 1950 Act, generally, was to terminate June 30, 1952. Title IV, as to price and wage stabilization, was to expire June 30, 1951. 64 Stat. 822. The latter date was extended to April 30, 1953. 66 Stat. 306, 67 Stat. 131. The survival of enforcement procedure in relation to prior violations is discussed in Section III of this opinion.

The Senate Report on the 1950 bill expressly said:

"This subsection [405 (b)] adopts the language of the Stabilization Act of October 2, 1942, respecting the penalties to be applied for violations of the wage and salary stabilization program. The committee finds that the disallowance of illegal wage payments as a cost of doing business, for purposes of computing taxes, Government contract payments, and for purposes of establishing price ceilings, was an effective deterrent." S. Rep. No. 2250, 81st Cong., 2d Sess. 39.

The regulations, procedures and practices comparable to those under the Act of 1942 were fully reported to Congress.[17]

Despite this history of administrative enforcement under the 1942 Act, appellee claims that, under the 1950 Act, the President had no authority to apply administrative action to the enforcement of wage stabilization. Appellee argues that § 706 of the later Act,[18] as set forth

---

[17] First Ann. Rep. of the Joint Committee on Defense Production, S. Rep. No. 1040, 82d Cong., 1st Sess. 98–103 (1951); Second Ann. Rep. of the same Committee, S. Rep. No. 3, 83d Cong., 1st Sess. 108–119 (1952).

[18] "Sec. 706. (a) Whenever in the judgment of the President any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the President that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order, with or without such injunction or restraining order, shall be granted without bond.

"(b) The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction of violations of this Act or any rule, regulation, order, or subpena thereunder, and of all · civil actions under this Act to enforce any liability or duty created

in the margin, vested enforcement of the Act in the District Courts and thus left to the President only authority to promulgate general regulations. We do not agree. Section 706 appears in Title VII containing the so-called "general provisions" of the Act. Appellee reads the section as sharply restricting the administrative procedure which we have just described. Such an interpretation, however, cannot be given to it in the face of § 405 (b). Instead of sharply restricting the revival of administrative enforcement of wage ceilings under § 405 (b), we read § 706 as primarily applicable to other activities under the Act. It applies naturally enough to price controls, credit controls and allocations of material. We hold that the specific language of § 405 (b) should receive the same construction now that was placed on similar language in the Act of 1942. The "general provisions" of § 706 do

---

by, or to enjoin any violation of, this Act or any rule, regulation, order, or subpena thereunder. Any criminal proceeding on account of any such violation may be brought in any district in which any act, failure to act, or transaction constituting the violation occurred. Any such civil action may be brought in any such district or in the district in which the defendant resides or transacts business. Process in such cases, criminal or civil, may be served in any district wherein the defendant resides or transacts business or wherever the defendant may be found; the subpena for witnesses who are required to attend a court in any district in such case may run into any other district. The termination of the authority granted in any title or section of this Act, or of any rule, regulation, or order issued thereunder, shall not operate to defeat any suit, action, or prosecution, whether theretofore or thereafter commenced, with respect to any right, liability, or offense incurred or committed prior to the termination date of such title or of such rule, regulation, or order. No costs shall be assessed against the United States in any proceeding under this Act. All litigation arising under this Act or the regulations promulgated thereunder shall be under the supervision and control of the Attorney General." 64 Stat. 817–818, as amended, 65 Stat. 139, 50 U. S. C. App. (1946 ed., Supp. V) § 2156.

not restrict the specific provisions of § 405 (b) now reenacted.[19]

The correctness of the above interpretation was underscored July 31, 1951, when Congress inserted a new § 405 (a).[20] In language strikingly similar to § 405 (b), that new section introduced administrative enforcement for price controls. Obviously it was not to be substantially eliminated by the existing provisions of § 706. As the specific language of § 405 (a) is thus controlling over the general provisions of § 706, so the same specific language in § 405 (b) is controlling over those same provisions.[21]

---

[19] That this is a logical interpretation of § 706 is emphasized by the fact that the bills which became the Act of 1950 contained, when introduced, provisions for credit and commodity controls but no provisions for wage stabilization. Thus the section that was to become § 706 originally had no reference to wage stabilization. Title IV, including § 405 (b) as to wage stabilization, was inserted in Committee. The separate origins of §§ 405 (b) and 706 point to the separate effect which should be given to them. See S. Rep. No. 2250, 81st Cong., 2d Sess. 5.

[20] ". . . The President shall also prescribe the extent to which any payment made, either in money or property, by any person in violation of any such regulation, order, or requirement [as to price control] shall be disregarded by the executive departments and other governmental agencies in determining the costs or expenses of any such person for the purposes of any other law or regulation, including bases in determining gain for tax purposes." 65 Stat. 136, 50 U. S. C. App. (1946 ed., Supp. V) § 2105 (a).

[21] This interpretation of § 405 (a) and (b) is consistent, likewise, with the interpretation given to § 5 of the Stabilization Act of 1942. The Stabilization Act of 1942 was superimposed on the Emergency Price Control Act of 1942, 56 Stat. 23, which already contained general provisions for judicial enforcement. The solution reached was to apply those general provisions (§ 205 (a) (b) and (c)) without restricting the administrative procedure prescribed in § 5 for wage control. 56 Stat. 33, 50 U. S. C. App. (1946 ed.) § 925 (a) (b) (c).

Finally, the text of § 403 uses the word "enforcement" in referring to the powers of the administrative agencies in connection with wage

We have noted the other arguments submitted by appellee concerning the interpretation and constitutionality of the statute but it would be premature action on our part to rule upon these until after the required administrative procedures have been exhausted.[22]

## III.

Finally, appellee contends that, by the termination of the substantive provisions of the Defense Production Act of 1950, all authority has now expired for determining or disallowing past, as well as future, payments made in violation of wage ceilings.

As the Act is a temporary statute, the effect of its expiration is governed by the following general savings statute:

> "The expiration of a *temporary statute* shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute,

controls. In referring to the new agency to be created, it provides that "such agency shall not delegate *enforcement* of any of the controls to be administered by it under this section to any other agency or department." (Emphasis supplied.) 64 Stat. 807, 50 U. S. C. App. (1946 ed., Supp. V) § 2103.

See also, the Conference Report on the Defense Production Act Amendments of 1952 which said: "The conference substitute is not intended to preclude the [Wage Stabilization] Board from, *as at present, enforcing* wage stabilization regulations and policies." (Emphasis supplied.) H. R. Rep. No. 2352, 82d Cong., 2d Sess. 24.

[22] The constitutional objections suggested are that the Act and proceedings which have been taken and are proposed under it violate (1) the Fifth Amendment by depriving appellee of property without due process of law; (2) the Sixth or Seventh Amendment by depriving appellee of the right to a jury trial; (3) the Eighth Amendment in authorizing excessive fines; (4) Article I, § 9, by authorizing an unapportioned direct tax; (5) Article I, § 1, by improper delegation of legislative power to the Executive; and (6) the Tenth Amendment by attempting to legislate on matters reserved to the States.

*unless* the temporary statute shall so *expressly* provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability." (Emphasis supplied.) 1 U. S. C. (1952 ed.) § 109.

We find no express, or even implied, provision in the Act contrary to the policy of the general savings statute. All of the alleged violations here involved occurred in 1951. The substantive provisions of Title IV relating to wage stabilization and the supporting orders fixing the wage ceilings here at issue did not expire until April 30, 1953. Neither that expiration date nor the six-month extension of it for liquidation purposes restricts the general provision of § 109 as to the survival of enforcement proceedings.[23]

The precise object of the general savings statute is to prevent the expiration of a temporary statute from cutting off appropriate measures to enforce the expired statute in relation to violations of it, or of regulations issued under

---

[23] "SEC. 717. (a) Title I [priorities and allocations] . . . title III [expansion of productive capacity and supply], and title VII [general provisions] . . . of this Act, and all authority conferred thereunder, shall terminate at the close of June 30, 1955. . . . Titles IV [price and wage stabilization] and V [settlement of labor disputes] of this Act, and all authority conferred thereunder, shall terminate at the close of April 30, 1953.

"(b) Notwithstanding the foregoing—

.          .          .          .

"(3) Any agency created under this Act may be continued in existence for purposes of liquidation for not to exceed six months after the termination of the provision authorizing the creation of such agency." 64 Stat. 822, as amended, 65 Stat. 144, 66 Stat. 306, 67 Stat. 131.

Executive Order No. 10434, February 6, 1953, 18 Fed. Reg. 809, suspended the wage stabilization program but provided that "This order shall not operate to defeat any suit, action, prosecution, or administrative enforcement proceeding, whether heretofore or here-

it, occurring before its expiration. *United States* v. *Allied Oil Corp.*, 341 U. S. 1, 5; *Fleming* v. *Mohawk Co.*, 331 U. S. 111.

A similar situation followed the expiration, in 1946, of the substantive provisions of the Stabilization Act of 1942,[24] and we have seen that the enforcement proceedings continued under it until 1949. See note 11, *supra*. On that occasion the authority to make disallowances was transferred to the Department of the Treasury. Exec. Order No. 9809, ¶10 (b), 11 Fed. Reg. 14281, 14283. In the present instance, wage stabilization enforcement has been transferred to the Director of the Office of Defense Mobilization. Exec. Order No. 10494, October 14, 1953, 18 Fed. Reg. 6585. The authority of the President to make such a delegation of his powers appears in §§ 703 and 705, and such authority remains effective until June 30, 1955, § 717 (a), note 23, *supra*.

The validity of the pending administrative proceeding being thus upheld, the judgment of the District Court enjoining that proceeding is

*Reversed.*

---

after commenced, with respect to any right, liability, or offense possessed, incurred, or committed, prior to this date."

See also, Hearings before the House Subcommittees on Appropriations, Pt. 1, 83d Cong., 1st Sess. 439–441, on The Supplemental Appropriation Bill, 1954, introduced in the House as H. R. 6200, and those on the same bill before the Senate Committee on Appropriations, 83d Cong., 1st Sess. 423–431.

[24] ". . . Though most of the controls have been lifted, the Act is still in effect. Liabilities incurred prior to the lifting of controls are not thereby washed out. *United States* v. *Hark*, 320 U. S. 531, 536; *Utah Junk Co.* v. *Porter*, 328 U. S. 39, 44; *Collins* v. *Porter*, 328 U. S. 46, 49. And Congress has explicitly provided that accrued rights and liabilities under the Emergency Price Control Act are preserved whether or not suit is started prior to the termination date of the Act. If investigation were foreclosed at this stage, such rights as may exist would be defeated, contrary to the policy of the Act." *Fleming* v. *Mohawk Co.*, 331 U. S. 111, 119.