October 20, 1978

**78-58   MEMORANDUM OPINION FOR THE DIRECTOR, COUNCIL ON WAGE AND PRICE STABILITY**

**Federal Property and Administrative Services Act of 1949 (40 U.S.C. § 481)—Government Contracts— Wage and Price Standards in Government Procurement**

This responds to your request for our opinion on several legal questions concerning an administration proposal to require the observance of wage and price guidelines by corporations and individuals as a condition for doing business with the Federal Government. We believe that the President has the statutory authority to require Government contractors to comply with wage and price guidelines as a prerequisite for doing business with the Government. This view was upheld in *AFL-CIO* v. *Kahn,* 48 U.S.L.W. 2005 (D.C. Cir. June 22, 1979), cert. denied, 443 U.S. 915 (July 2, 1979). We also believe that the Government can require Government contractors to receive from their subcontractors and suppliers certificates that the latter are in compliance with wage and price guidelines with regard to the products and services involved in contracts related to the contractors' Government work.

### I. The President's Power to Establish Procurement Policies

In § 201 of the Federal Property and Administrative Services Act of 1949 ("1949 Procurement Act"), 40 U.S.C. § 481, Congress established that Government procurement policies must be designed to promote "economy" and "efficiency" in Government procurement. In § 205(a) of the 1949 Procurement Act, 40 U.S.C. on § 486(a), Congress specifically conferred on the President the power to

> . . . prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the Administrator [General Services] and executive agencies . . . .

As interpreted by the United States Court of Appeals for the Third Circuit, § 205(a) grants broad discretion to the President to protect and advance a range

of governmental interests, including "the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs . . . ." *Contractors Association of Eastern Pennyslvania* v. *Secretary of Labor,* 442 F. (2d) 159, 170 (3d Cir. 1971), cert. denied, 404 U.S. 854 (1971).

In the *Contractors* case, the Third Circuit considered and affirmed the validity of the "Philadelphia Plan" promulgated pursuant to Executive Order No. 11246, 3 CFR 406 (1969), 42 U.S.C. § 2000e note. The Third Circuit, as well as other courts of appeals, have consistently upheld the principle that § 205(a) of the 1949 Procurement Act confers on the President the power to require nondiscrimination provisions in all Government contracts. *See, e.g., Farkas* v. *Texas Instrument, Inc.,* 375 F. (2d) 629 (5th Cir. 1967), cert. denied, 389 U.S. 977 (1967); *Southern Illinois Builders Association* v. *Ogilvie,* 327 F. Supp. 1154 (S.D. Ill. 1971), *aff'd,* 471 F. (2d) 680 (7th Cir. 1972). Prior Attorneys General have also opined that Executive Order No. 11246 and its predecessors were valid exercises of statutory authority. *See* 42 Op. A.G. 97 (1961) (sustaining validity of Executive Order 10925); 42 Op. A.G. 405 (1969) (sustaining validity of revised "Philadelphia Plan").

In its most recent encounter with a challenge to Executive Order No. 11246, the United States Court of appeals for the Fifth Circuit observed that decisions of other courts of appeals had "candidly acknowledged the validity of the use by the President or Congress of the procurement process to achieve social and economic objectives." *United States* v. *New Orleans Public Services, Inc.,* 553 F. (2d) 459, 466-67 (5th Cir. 1977), *vacated on other grounds,* 436 U.S. 942 (1978).[1] We believe that the backdrop formed by *New Orleans Public Service* and prior cases interpreting § 205(a) of the 1949 Procurement Act suggests that in order to assess the general validity of a program requiring compliance with the wage and price guidelines as a condition for doing business with the Government, two questions must be considered. First, is such a program authorized under the 1949 Procurement Act? Second, is such a program inconsistent with any other statutes?

*A. Authority Under the 1949 Procurement Act.* We conclude that the 1949 Procurement Act authorizes the proposed requirement of compliance with the wage and price guidelines. The general purpose of the proposed program—to lower costs to the Government of the goods and services it purchases—is clearly consistent with the purposes of the Act. Nor does the program conflict with any specific provision of the Act.

---

[1] In support of this statement, the court cited *Rosetti Contracting Co.* v. *Brennan,* 508 F. (2d) 1039, 1045 n. 18 (7th Cir. 1975), and *Northeast Construction Co.* v. *Romney,* 485 F. (2d) 752, 760 (D.C. Cir. 1973).

*B. Inconsistency With Other Statutes.* The question whether the program as devised is inconsistent with other statutes raises more subtle and difficult problems. In the *New Orleans Public Service* case discussed above, the Fifth Circuit accepted the Government's contention that Executive Order No. 11246 was authorized not only by § 205(a) of the 1949 Procurement Act, but also by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Equal Employment Opportunity Act of 1972, 86 Stat. 103, which amended Title VII. The court concluded that the order represented "a long standing program which Congress has recognized and approved." 553 F. (2d) at 467.[2] The court's analysis suggested that the 1949 Procurement Act, standing alone, did not provide sufficient authority for the order but for the fact that it was supported by a long history of the use of the procurement process to combat discrimination against minorities, a use that had been, in effect, ratified by the Congress.

We are unaware of any statute other than the 1949 Act which might be viewed as a source of statutory authority for this program. Implicit in the Fifth Circuit's opinion and its discussion of *Youngstown Sheet & Tube,* note 2, *supra,* was the assumption that if Congress had passed some other statute which was inconsistent with the order, then the court may have ruled differently on the validity of the order.[3] It follows that a statute inconsistent with this wage and price program would be viewed as a limitation on the power conferred by § 205(a) of the 1949 Procurement Act.

The lack of other supportive statutory authority to implement this program does not pose a significant problem, primarily because the program is demonstrably more closely related to the purposes of the 1949 Procurement Act than the antidiscrimination programs established by Executive Order No. 11246 and its predecessors. Thus, while courts may have felt obliged in Executive Order No. 11246 cases to look for additional statutory support for the antidiscrimination policies embodied in the order, we believe that the 1949 Procurement Act itself provides an ample statement of relevant national policy and authority—to procure goods and services for the Government in an economical fashion.

We now turn to the more difficult question, whether the program would conflict with some other statute. We believe that those aspects of the program requiring individuals and companies doing business with the Government to

---

[2]In a footnote accompanying this conclusion, the court dismissed an argument that Executive Order No. 11246 constituted executive "lawmaking" of the type prohibited by the Court's decision in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579 (1952). *See* 553 F. (2d) at 467-68, n. 8.

[3]Such an assumption has been adopted in virtually all cases prior to *New Orleans Public Service* in which the validity of Executive Order No. 11246 has been challenged and upheld. *See, Southern Illinois Builders Ass'n* v. *Ogilvie,* 327 F. Supp. 1154, 1162 (S.D. Ill. 1971), *aff'd,* 471 F. (2d) 680 (7th Cir. 1972); *Joyce* v. *McCrane,* 320 F. Supp. 1284, 1291 (D. N.J. 1970); *Contractors Ass'n of Eastern Pennsylvania* v. *Secretary of Labor,* 442 F. (2d) 159, 171-175 (3d Cir. 1971), cert. denied, 404 U.S. 854 (1971).

avoid price increases beyond a specified level may be inconsistent with 50 U.S.C. App. § 645b. That provision reads as follows:

> Nothing contained in this Act or any other Federal Act (except the Emergency Price Control Act of 1942, as amended, the Stabilization Act of 1942, as amended, or the District of Columbia Emergency Rent Act, approved December 2, 1941, as amended), shall be construed to authorize the establishment by any officer or agency of the Government of maximum prices for any commodity or maximum rents for any housing accommodations.

The provision would appear to impose on the executive and judicial branches a rule of statutory construction that would prohibit a finding of implicit, as opposed to explicit, power in any Federal statute to establish "maximum prices" for "any commodity,"[4] whether the commodity is sold solely within the private sector or to the Government. Because the setting of a percentage guideline beyond which a contractor may not increase his prices charged to the Government would appear as the setting of a "maximum price," it could be argued that § 645b, on its face, bars the President from utilizing the 1949 Procurement Act, or any other statute, to establish and enforce price guidelines even with regard to those who do business with the Government.

The legislative history of § 645b does not clearly indicate whether the Congress passing the provision necessarily intended it to condition a subsequently enacted statute, here § 205(a) of the 1949 Procurement Act. In June of 1946, President Truman vetoed a bill which would have extended, as amended, the Emergency Price Control Act of 1942 (EPCA), 56 Stat. 23, because of his view that the bill was inadequate. Under the 1942 Act, discussed in greater detail below, the President was empowered to establish maximum prices with regard to a wide range of goods and services sold within the private sector and to the Government. In apparent anticipation of the President's veto, a late amendment was added by Senator Moore to a bill extending various powers under the Second War Powers Act, 56 Stat. 176.

Most titles of the Second War Powers Act expired or were repealed by June 30, 1950, but the Moore amendment had no express expiration date and it has never been repealed. Later in 1946, a law extending the EPCA (but not the Stabilization Act of 1942) was adopted. That law provided for ceilings on rents and most prices but added a number of important exceptions.

We believe that the intent of Senator Moore and the Congress in adopting § 645b was limited to placing a prohibition on President Truman's construing any *then existing* Federal statutes as conferring on him power to control prices until such time as he and the Congress resolved their dispute over the extension of the EPCA. We find nothing inconsistent with this interpretation of § 645b in the congressional debates on the Moore amendment, 92 Cong. Rec. 7312

---

[4]The meager legislative history of the provision suggests that its reference to prices of "any commodity" was intended to include the full range of goods and services included in the Emergency Price Control Act of 1942, 56 Stat. 23. *See* H. Rept. No. 2395, 79th Cong., 2d sess. (1946); 92 Cong. Rec. 7312, 7872, 7926 (1946).

(1946). In addition, we are unable to find any evidence that any Congress subsequent to the Seventy-ninth has viewed § 645b as having continued vitality.[5]

With regard to those aspects of the proposed program that require compliance with wage guidelines by employers doing business with the Government, a potential problem is presented by the Davis-Bacon Act, 40 U.S.C. § 276a, which generally requires Government contractors to pay minimum levels of wages to their employees. Should wages in the private sector rise at a greater rate than that established by the wage guidelines to be issued under this program by the Council on Wage and Price Stability, it may become necessary for the President to exercise his authority under 40 U.S.C. § 276a-5, § 6 of the Davis-Bacon Act, to suspend application of the Act.[6] In addition, under Title II of the National Emergencies Act of 1972, Pub. L. No. 94-412, a Presidential declaration of national emergency required in order to suspend Davis-Bacon would be subject to veto by a concurrent resolution of the Congress. We believe that the so-called legislative veto device such as that contained in the 1976 Act is unconstitutional. However, this issue has not yet been resolved by the courts and, therefore, were Congress to pass such a concurrent resolution, we may anticipate a suit to be filed attempting to block the suspension.

In considering whether the use of wage and price guidelines to control the price of goods and services to the Government is inconsistent with statutes other than the 1949 Procurement Act, we believe it is important to recognize that there is no history of the use of such guidelines. This is important because most of the decisions upon which we would rely in litigation—those upholding Executive Order No. 11246—were decided several decades after President Roosevelt first implemented an anti-discrimination program in 1941. *See* Executive Order No. 8802. When the courts finally came to pass on the validity of Executive Order No. 11246, the authority to issue that order and its predecessors was historically well established. In contrast, the history of mandatory wage and price controls from World War II to the present suggested a pattern of tight congressional control over both the delegation of power to the President and over its exercise. Moreover, control of the wages and prices of Government contractors has always been treated as part of general controls over the entire economy.

On April 11, 1941, President Roosevelt established the Office of Price Administration and Civilian Supply. Executive Order No. 8734, 6 Fed. Reg.

---

[5]It could not be successfully contended that the 1949 Act implicitly repealed the Moore amendment given the burden usually imposed on those arguing that a statute has been repealed by implication. *See, Tennessee Valley Authority* v. *Hill*, 437 U.S. 153, 187 (1978).

[6]The experience of this office with a previous suspension of Davis-Bacon in 1971 suggested several problems that we may expect to arise should that Act or any one of some 61 other similar statutes identified in 1961 require suspension. First, any suspension should be applied prospectively. Second, some contractors who deal with the Government may also be subject to State laws similar to Davis-Bacon. *See, e.g.*, N.Y. Labor Law, Art. 8; Cal. Labor Code §§ 1771 *et seq*. This office concluded in 1970 that suspension of Davis-Bacon would have the effect of suspending or preempting any applicable State laws.

243

1917. That agency was empowered to issue formal price schedules, but relied for enforcement solely on publicity and persuasion. One of the functions conferred on the agency by § 2(d) of the order was to

> Advise and make recommendations to other departments and agencies . . . in respect to the purchase or acquisition of materials and commodities by the Government [and] the prices to be paid therefor . . . .

On July 30, 1941, President Roosevelt transmitted to Congress a message requesting legislative authority to deal with the impact of inflationary price rises.[7] The President pointed out that one consequence of the inflationary spiral was the increase in "[c]osts to the Government." In asking for the legislation, the President also stated that, "[l]ike other defense legislation, it should expire with the passing of the need, within a limited time after the end of the emergency."

The 77th Congress responded by enacting the Emergency Price Control Act of 1942. Section 1(a) declared two purposes of that Act to be: (1) insuring "that defense appropriations are not dissipated by excessive prices"; and (2) preventing "hardships" that would befall "Federal, State, and local government, that would result from abnormal increases in prices." But Congress did not grant power to control wages, and in the Senate report on the Act it was stated that wage controls

> . . . could, in no event, be acceptable unless coupled with direct and specific determination of the salaries of management, the dividends of stockholders, the interest payments received by bondholders, the incomes of farmers or merchants of professional persons and of all others.[8]

The EPCA also dealt specifically with the regulation of the prices of agricultural commodities, proscribing any control until those prices exceeded 110 percent of parity or the levels reached during any one of three previous periods, whichever was highest.

On October 2, 1942, Congress passed the Stabilization Act, 56 Stat. 765, which gave the President the power to impose ceilings over agricultural prices and to forbid wage raises that had not been approved by the War Labor Board. Under § 5(a), the Government was entitled to disregard wage payments ruled to be illegal for several purposes, including, *inter alia*, "compensation under cost-plus contracts and other governmental transactions." *See, Allen* v. *Grand Central Aircraft Co.,* 347 U.S. 535 (1954).[9]

In September of 1950, Congress passed the Defense Production Act (DPA), which granted authority to the President to control prices either selectively

---

[7] *See* H. Doc. No. 332, 77th Cong., 1st sess. (1941).

[8] *See* S. Rept. No. 931, 77th Cong., 2d sess. 12 (1942).

[9] Under the regulations published pursuant to the Stabilization Act, a determination by the National War Labor Board that wage payments were in contravention of that Act was "conclusive upon all Executive Departments and agencies . . . for the purpose of determining costs or expenses under any contract made by or on behalf of the United States." 7 F.R. 8749 (1942).

within one industry or sector of the economy or across the board.[10] If prices were controlled, then wages would also be required to be controlled. The DPA, as had the Stabilization Act, contained an explicit provision empowering the President to determine whether "any wage, salary, or other compensation" had been paid in violation of the controls and to "prescribe the extent" to which such illegal payments could be "disregarded by the executive departments and other governmental agencies" with regard to Government contracts. The Supreme Court later observed that the "substance" of these two provisions was "inescapably the same." *Allen* v. *Grand Central Aircraft Co., supra,* at 546.[11]

In the *Allen* case, the Government contractor argued that the regulations mandating the disallowance of illegal wages in computing the sums owed for work or goods sold to the Government were not authorized by the DPA. The Government's brief discussed in detail the history of administrative sanctions to enforce the wage provisions of the Stabilization Act[12] and noted the degree of oversight which Congress had exercised during its existence.[13]

In 1970, Congress reentered the field of wage and price controls by enacting another Economic Stabilization Act, 84 Stat. 799, which generally empowered the President to impose wage and price controls even though President Nixon had specifically opposed the grant of such authority.[14] Nothing in the legislative history of the 1970 Act suggested that Congress believed that there was any other statutory authority in the Executive to impose wage and price controls.

In 1971, after the President had used the authority under the 1970 Act to freeze wages and prices for a 90-day period, Congress considered administration and other proposals to extend the wage and price control authority beyond the expiration date of April 30, 1972. As finally enacted, the Stabilization Act Amendments of 1971 added to the President's arsenal the power to "stabilize" interest rates, corporate dividends and "similar transfers."[15]

In enacting the 1971 amendments, Congress did much to fill in the details that had not been addressed by the 1970 Act. This was done as least partially in reponse to the decision in *Amalgamated Meat Cutters & Butchers Workmen* v. *Connally,* 337 F. Supp. 737 (D.D.C. 1971) (three-judge court), in which a claim that the 1970 Act constituted an unconstitutional overbroad delegation of legislative power to the Executive had been rejected. Nothing in the *Amalgamated* case suggested any source of power in the President to impose wage and price controls other then the 1970 Act, which the Court upheld largely on the theory that its "fair and equitable" standard and other statutory details were

---

[10]The DPA, like its predecessors, contained a termination date (June 30, 1951) for wage and price control authority, an authority subsequently extended, 64 Stat. 822, to April 30, 1953.

[11]Under the regulations promulgated pursuant to the DPA the "sanction" against employers who paid illegal wages to their employees in connection with work performed on Government contracts was disallowance of the illegal wages paid in computing the money due under the contract or from the Government. *See* 16 F. R. 6028, 6029, 7284 (1951).

[12]Brief, at 43-58.

[13]*Id.*, at 43-49.

[14]*See* H. Rept. No. 1330, 91st Cong., 2d sess. 16 (1970) (minority views).

[15]S. Rept. No. 507, 92d Cong., 1st sess. (1971).

sufficiently particular when the Act was read in the context of the legislation discussed above.

Finally in 1974, after the expiration of the 1970 Act, as amended, Congress enacted legislation establishing the Council on Wage and Price Stability. In hearings on the legislation, the administration made clear that

> . . . we are not requesting the statutory authority to impose mandatory wage and price controls or the authority to delay wage and price increases. The mere existence of such authority has in our opinion an adverse impact on expectations. The name of the game becomes "raise prices and wages now before the Government intervenes." Statutory authority to delay wage and price increases would lead to the belief that the Government was on its way back to mandatory controls. This could result in anticipatory wage and price increases that would be highly inflationary.[16]

As enacted, this legislation contained an explicit provision that nothing in it "authorizes the continuation, imposition, or reimposition of any mandatory economic controls."[17]

The history recounted above involved wage and price controls applicable to the entire economy or to specific sectors of the economy. The question of special efforts to impose wage and price restraint on Government contractors as part of procurement policy has never been addressed. Successful defense of the proposed program may well turn on the Government's ability to show that the requirement of compliance with wage and price guidelines by those doing business with the Government does not constitute the kind of regulation of wages and prices in the general economy which Congress has assumed can be authorized only through a specific delegation of power to the President, or perhaps by direct statutory regulation by Congress itself.

The Senate recently adopted, as an amendment to S. 3077, a "sense of the Senate" resolution which expressed the view that no statute, including specifically the 1949 Procurement Act, was intended by prior Congresses to confer on the President the authority for the program you have proposed. *See* 124 Cong. Rec. S. 16781-82 (daily ed. Sept. 30. 1978). But the resolution merely expresses the "objection" of the Senate to implementation of a program like the one at issue here. It is not a law and it is not legally binding. Furthermore, the Supreme Court has indicated that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States* v. *Philadelphia National Bank,* 374 U.S. 321, 348-49 (1963), quoting *United States* v. *Price,* 361 U.S. 304, 313 (1960).

---

[16]*See, Hearings on Cost of Living Task Force before the Senate Committee on Banking, Housing, and Urban Affairs,* 93d Cong., 2d sess. 67 (1974).

[17]S. Rept. No. 1098, 93d Cong., 2d sess. 3 (1974). That same report had taken the position that the bill "would grant no mandatory or standby control authority over the economy." *Id.,* at 1.

## II. Legality of the Options Under Consideration

You asked us to address the following two questions: (1) "would a directive by the President that federal agencies not procure from firms which are on the CWPS list be upheld in court," and (2) "would a directive be upheld if it precluded awards to firms which although in compliance with the standards for the products which the agency was procuring, was not in compliance for its other products."

Under the first type of directive, a contractor is generally barred from doing business with the Government if its business activities as a whole are found to be in noncompliance with the wage and price guidelines established by the Council. Thus, a contractor whose Government-related operations are in compliance could nevertheless be barred because its overall operations are not in compliance. Under the second type of directive, a contractor who can convincingly separate his non-Government from his Government operations is bound to adhere to the wage and price guidelines only with regard to the latter operations.

We believe that the difference between the two types of directives will probably have little impact on the validity of the overall program if the principles established in the Executive Order No. 11246 cases are applied by the courts to this program. We conclude this because, under the reasoning of *Rosetti Contracting Co.* v. *Brennan*, 508 F. (2d) 1039, at 1045, n. 18 (1975), a program will be upheld even if the relationship between prices paid by the Government and the objectives of the program itself are somewhat "attenuated." *See generally, United States* v. *New Orleans Public Service, Inc.*, 553 F. (2d), at 467-68, n. 8.[18]

However, the more direct the connection between compliance with wage and price guidelines and lower costs to the Government, the stronger is your argument that the program is in furtherance of the purpose of the 1949 Procurement Act to procure goods and services for the Government more economically and efficiently. Therefore the case with respect to goods and services supplied to the Government will be stronger than for other products of a Government contractor.[19]

Next, you raised a question whether "a contractual requirement in a prime contractor's contract that it require certification of compliance of its subcontractors and suppliers" would be upheld. A similar provision is contained in § 203 of Executive Order No. 11246. We believe that such a provision would be upheld along with the basic program; neither provision would place any enforcement responsibility on the contractor himself.

---

[18]Under this principle, we think a court would probably accept the argument that applying wage and price guidelines to all phases of a corporation's business would, over the "long run," *id.*, at 170, decrease procurement costs to the Government.

[19]We note that in cases where a contractor cannot satisfactorily segregate his Government and non-Government related operations, debarment of the contractor should be possible under the second type of directive without implicating the broader reach of the first type of directive.

You also asked whether "the exclusion from this program of contracts awarded under formally advertised procedures significantly improves" the chances that either program would be upheld. Because there is no requirement that formally advertised contracts be awarded to the lowest bidder, *see* 41 U.S.C. § 253(b), we believe that the inclusion of such contracts within the reach of the program should not significantly affect the legality of the program one way or the other. Again, it may be that the degree to which the total economy is directly affected by this program would be a factor in judicial consideration of an argument that the program is in effect a general, mandatory wage and price system which can be imposed only pursuant to congressional authorization.

Finally, we address the implicit issue whether debarment is an appropriate and authorized sanction for violation of wage and price guidelines. Under analogous case law, *e.g., Copper Plumbing & Heating Co.* v. *Campbell,* 290 F. (2d) 368 (D.C. Cir. 1961), as well as those cases upholding Executive Order No. 11246, we believe that debarment is an appropriate remedy. At the same time, in at least one case sustaining debarment in the absence of explicit statutory authority, the court added that debarment cannot occur "without either regulations establishing standards and a procedure which are both fair and uniform or basically fair treatment" of those debarred. *Gonzalez* v. *Freeman,* 334 F. (2d) 570, 580 (D.C. Cir. 1964). This case strongly suggested that if debarment is utilized as a remedy, scrupulous attention must be given to insure that the standards for exceptions are clearly established by regulation and that those standards are applied uniformly.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*